## CONTINENTAL NAT. BANK v. HEILMAN et al.

(Circuit Court, D. Indiana. June 5, 1897.)

**1. PRINCIPAL AND AGENT—NOTE SIGNED BY AGENTS INDIVIDUALLY.**

M. and H., who were the agents of the subscribers to a syndicate formed to buy the securities of two railroads, executed to the C. Bank, through which the financial operations of the syndicate were carried on, a note for $100,000, which was headed "M.-H. Syndicate," and read: "On demand the undersigned promise to pay * * *, having deposited with said bank as collateral security for this or any other liability of —— to the said bank * * * syndicate securities and agreement,"—signed by M. and H. in their own names. The loan was entered in the discount book of the bank as made to the M.-H. Syndicate. A guaranty taken by the bank described the note as the note of the M.-H. Syndicate, and demands for interest from time to time were addressed by the bank to the M.-H. Syndicate. *Held,* that the note was the obligation of the syndicate, and not the individual debt of M. and H.

**2. EVIDENCE—WAIVER OF OBJECTIONS—COURT RULES.**

Rule 34 of the circuit court for the district of Indiana, requiring the filing of briefs on all motions, demurrers, and exceptions, in default of which they are waived, does not apply to objections made on the trial to the competency of evidence contained in a deposition.

**3. COMPETENCY OF WITNESSES—SUIT AGAINST HEIRS—AGENT OF DECEDENT— FEDERAL COURTS.**

Rev. St. § 858, does not provide for the case covered by the Indiana statute (Rev. St. 1894, § 508; Rev. St. 1881, § 500) excluding, as against the heirs or representatives of a decedent, the testimony of one who has acted as an agent in making or continuing a contract with such decedent, and such statute is the rule of decision as to the competency of such testimony in the federal courts.

**4. FEDERAL COURTS—JURISDICTION—SUIT TO CHARGE HEIRS—LIMITATION OF ACTIONS.**

The federal courts have original and inherent jurisdiction, apart from any state statutes, to take cognizance of a suit by a creditor to charge heirs, devisees, and legatees, to the extent of the assets taken by descent or devise, with ancestral debts, and they are not restricted therein by state statutes limiting the time for bringing such suits, but the right to maintain such a suit may be lost by laches, and a failure to proceed within the time limited by a state statute may be evidence of laches.

**5. LACHES — FAILURE TO PRESENT CLAIMS AGAINST DECEDENT'S ESTATE — DEPRECIATION OF COLLATERAL.**

When one who claims to be a creditor of a deceased person neglects for over three years to present his claim, of which the representatives of the decedent are ignorant, and in that time collateral securities held for the claim depreciate from more than its amount to much less, such creditor is guilty of laches which bars him from proceeding in equity against the heirs and devisees of the decedent.

A. C. Harris, for complainant.

Gilchrist & De Bruler and Duncan, Smith & Hornbrook, for defendants.

BAKER, District Judge. This is a suit brought by the complainant against the widow and heirs of William Heilman, deceased, to charge them, as devisees and legatees under the last will of the decedent, with the amount of a promissory note for $100,000, alleged to have been executed by the decedent and David J. Mackey to the complainant. The note is as follows:

Mackey-Heilman Syndicate.

$100,000.　　　　　　　　　　　　　　　New York, April 10, 1889.

On demand the undersigned promise to pay to the Continental National Bank of New York or order, at their banking house, one hundred thousand dollars, for value received, with interest at the rate of ——— per cent. per annum, having deposited with said bank, as collateral security for this or any other liability of ——— to the said bank, the property stated below, with authority to sell the same, or any securities added thereto or substituted for the same, at any broker's board, or at public or private sale, at the option of said bank, on the nonperformance of this promise, and without notice; the proceeds, after deducting expenses, to be applied to the payment of ——— indebtedness to the said bank, any surplus to be returned to ———, and holding ——— liable for any deficiency. Market value this day. Syndicate securities and agreement.

[Signed]　　　　　　　　　　　　　　　D. J. Mackey.
　　　　　　　　　　　　　　　　　　　William Heilman.

$2,094,000 Lou. Ev. & St. L. 2nd Mtg. bonds.
　9455 shs. do.　　do.　　Pfd.
　9017　"　　"　　"　　Comm.
　1400　" Ill. & St. L. R. & Coal Co. Pfd. stock.

This note grew out of a transaction of the so-called "Mackey-Heilman Syndicate." This syndicate was formed by a subscription paper, which is set out in the evidence. Its objects were to buy the securities of the Louisville, Evansville & St. Louis Railroad Company and those of the Illinois & St. Louis Railroad & Coal Company, to consolidate the two companies, and to issue the bonds and stock of the consolidated company to the subscribers to the syndicate in proportion to the amount of their several subscriptions. The agreement provided that the securities should be purchased at the prices fixed therein. Heilman and Mackey were made, for that purpose, the agents of the subscribers to the syndicate agreement. The subscriptions were to be paid to the Continental National Bank as those agents called for them. The resulting securities were to be divided among the subscribers in proportion to the amounts of their subscriptions. The Continental National Bank was made the agent of the syndicate to receive the subscriptions, to receive the securities purchased, to cause them to be converted into securities of the consolidated company, and to make distribution of the new securities among the subscribers. In all these matters, and in all matters relating to the note in suit, Mr. Randolph, the president of the bank, acted for it as its agent with full authority. The syndicate agreement was dated February 11, 1889. On February 15, 1889, the complainant lent to the syndicate $50,000 on a note similar in all respects to the one in suit. Both notes were guarantied by Mr. Baldwin by a separate instrument in writing. The bank took its pay for the $50,000 note out of the syndicate moneys, making no demand for payment upon Heilman or Mackey. On February 25, 1889, the draft of Heilman and Mackey for $112,000, with stock of the Illinois & St. Louis Railroad & Coal Company attached (which stock had been bought by them for the syndicate), was paid by the bank out of syndicate funds. Subscriptions were made from time to time, and on April 8, 1889, Heilman and Mackey were in Boston securing further subscriptions. At this time they borrowed $100,000 from the Bank of North America. They had previously headed the subscriptions with $100,000 each. Upon borrowing the $100,000 from the

Bank of North America, they jointly subscribed an additional $100,-000. They then applied to the complainant for more money, and it sent them $100,000 to be used in purchasing the securities for the syndicate. Two days later Heilman and Mackey returned to New York, and the note in suit was then signed by them. The loan of the $100,000, as shown by the discount book of the bank, was made to the Mackey-Heilman Syndicate. The application for the loan is shown by the offering book of the bank to have been made by the Mackey-Heilman Syndicate. At the time the bank took the guaranty of Mr. Baldwin for the payment of the loan he was one of the directors of the complainant, and one of the subscribers to the syndicate agreement. The guaranty described the note as that of the Mackey-Heilman Syndicate, and Mackey and Heilman were not mentioned as makers of the note. The bank afterwards sent demands for interest to Mr. Baldwin, which were in every instance addressed to the Mackey-Heilman Syndicate. In no book entry or paper produced in evidence was this note described by the complainant as the note of Mackey and Heilman, but always as the note of the Mackey-Heilman Syndicate. In every other case to be found in the offering book of the bank the name of the actual borrower is put down. This loan was made to the Mackey-Heilman Syndicate upon the pledge of the securities purchased by the syndicate.

In my opinion, the evidence shows that the loan was made to the Mackey-Heilman Syndicate for syndicate purposes, and it was not understood to be, nor was it in fact, the individual loan or debt of Heilman and Mackey. They signed the note as agents of the syndicate. It was not understood at the time that they were to be liable upon the note as for their own personal debt. The complainant has made no effort to collect the note from the syndicate, nor from Mr. Baldwin, the guarantor. Until legal recourse is exhausted, no suit in equity is maintainable against the heirs of a deceased maker of the note. Even though the note may have created a personal liability against Mackey and Heilman alone, and not a liability against the members of the syndicate, the court is of opinion that the subsequent conduct of the complainant shows that it became a subscriber to the syndicate for the amount of this loan. It made the distribution, designating itself as a subscriber to the syndicate to the amount of $100,000. It set apart to itself the share of securities to which it was entitled as such subscriber. It sent a copy of the distribution sheet, showing what it had done, accompanied by a letter written by Mr. Randolph to Mr. Heilman, asking him to advise the bank if what it had done was not satisfactory to him. Mr. Heilman answered, but the complainant professes its inability to produce his letter. However, it is not claimed that Mr. Heilman expressed any dissent. The written evidence, and the conduct of the parties prior to Mr. Heilman's death, are in harmony with this view, and in conflict with any other. After Mr. Heilman's death, there were some acts on the part of the bank inconsistent with the view that it became a subscriber to the syndicate. No notice of such purpose was communicated to the executrix of the Heilman estate, nor to any one interested therein, until after the estate had been finally set-

tied by the decree of the circuit court of Vanderburg county, Ind. Mr. Heilman died testate in that county September 22, 1890. His will was probated September 27, 1890, and letters testamentary thereon were issued to his widow, Mary Jenner Heilman. Notice of such appointment was immediately given in the manner provided by law. The estate was finally settled, and the executrix discharged on December 16, 1893. At no time pending the settlement of the estate did the executrix, or any one of the defendants, have notice or knowledge of the existence of the note in suit, or of the alleged collateral securities.

The conduct of the complainant in respect to the note and securities is inconsistent with its present contention, and the conduct of Mr. Heilman is explainable only on the theory that he regarded his liability on the note as extinguished, and that he had no claim upon the securities which had been taken by the bank upon their distribution. After Mr. Heilman's death, the complainant dealt with these securities by exchanging a part of them for other securities as though it was the absolute owner of them. The excuse offered is that it understood that Mr. Baldwin was the agent of Mr. Heilman in respect of these securities, and that Mr. Baldwin assented to such exchange. The evidence of such agency is of doubtful and uncertain character; and, even if he was such agent, the death of Mr. Heilman terminated such agency. Knowing of his death, the complainant was bound to know and did know that Mr. Baldwin had no right to speak for a dead man. So, unless complainant was the absolute owner of these securities, its conduct in making such exchange was wrongful and fraudulent. The court prefers to explain the conduct of the complainant on the theory that it had become the owner of the securities, and thus rightfully exchanged a part of them, rather than to impute fraudulent and wrongful conduct to it. The failure to collect the note is sought to be explained by the testimony of Mr. Randolph to the effect that after the making of the note and the distribution of the securities Mr. Heilman told the witness that he wanted to let the note run because the securities would at any time be worth more than enough to pay it off. The counsel for the defendants at the hearing moved to suppress so much of the deposition of Mr. Randolph as detailed the statements of the decedent to him in relation to the note and securities on the ground that the witness was in such interviews acting as the agent of complainant in making and continuing the contract. Counsel for complainant insist that the objection so taken is waived under rule 34 of this court. This rule is as follows:

"Ordered, that all motions, demurrers, and exceptions hereafter filed must be supported by written or printed briefs, to be filed in duplicate with such motion, demurrer, or exception. Failure to file such briefs shall be deemed a waiver."

This rule was not intended to apply, nor has it ever been construed by the court as applying, to objections made, on the trial or hearing, to the competency of evidence contained in a deposition. Where the objection seeks the suppression of the deposition for some curable defect, a motion to suppress is required to be made seasonably before the trial or hearing. But when the objection goes solely to the

competency of particular parts of the deposition, and when the objection of incompetency cannot be avoided by retaking the deposition, it has been the constant and uniform practice of the court to consider and decide upon such objections during the progress of the trial.

Counsel further insist that Mr. Randolph is not a party, under section 858, Rev. St. U. S., and is not excluded by the proviso; citing Potter v. Bank, 102 U. S. 163; Bank v. Jacobus, 109 U. S. 275, 3 Sup. Ct. 219; and Snyder v. Fiedler, 139 U. S. 478, 11 Sup. Ct. 583. The statute is as follows:

"In the courts of the United States no witness shall be excluded in any action on account of color, or in any civil action because he is a party to or interested in the issue tried: provided, that in actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other, as to any transaction with, or statement by, the testator, intestate or ward, unless called to testify thereto by the opposite party, or required to testify thereto by the court. In all other respects the laws of the state in which the court is held shall be the rules of decision as to the competency of witnesses in the courts of the United States in trials at common law, and in equity and admiralty."

In Potter v. Bank, supra, it is held that in an action against an executor in his representative capacity a witness who was interested in the issue, but was not a party thereto, was competent, and his evidence admissible.

In Bank v. Jacobus, supra, a creditor had obtained judgment against one Patterson. He levied on capital stock in a corporation claimed by Jacobus under an assignment from Patterson, and in the original suit summoned Jacobus, as garnishee of Patterson, to answer. Pending these proceedings, Patterson died, and his administrator was substituted as defendant. Jacobus and the administrator were offered as witnesses on Jacobus' behalf in regard to transactions at the time of the assignment. It was held that each was a competent witness on his own motion, notwithstanding the proviso to section 858. The court said:

"The real issue was between the bank and Jacobus, and consequently the case is within the first clause of section 858, which provides that 'No witness shall be excluded * * * in any civil action because he is a party to or interested in the issue tried.' Within the meaning and object of the proviso, this is not an action by or against an administrator, in which judgment may be rendered for or against him."

In Snyder v. Fiedler, supra, the administratrix of her husband's estate commenced suit to recover a claim alleged to be due the estate. She resigned, and was discharged, and an administrator de bonis non was appointed and qualified, and appeared, and obtained leave to prosecute the suit as plaintiff therein. It was held that she was a competent witness for the plaintiff at the trial.

These cases decide that no witness can be excluded because he is a party to or interested in the issue. The objection to the testimony of Mr. Randolph is not upon either of these grounds. The objection is that he was the agent of complainant in making and continuing the contract involved in suit. The last clause of section 858 makes the law of the state the rule of decision in all other respects

than those provided for in the preceding part of the section. The statute of this state (Rev. St. 1894, § 508; Rev. St. 1881, § 500) provides that:

"No person who shall have acted as an agent in the making or continuing of a contract with any person who may have died, shall be a competent witness in any suit involving such contract, as to matters occurring prior to the death of such decedent, on behalf of the principal to such contract against the legal representatives or heirs of such decedent, unless he shall be called by such heirs or legal representatives."

Section 858 does not provide for the case covered by the state statute. Neither section 858 nor the construction placed upon it by the cases cited supra affects the application of the state law to the question of the competency of the agent to testify for his principal. Mr. Randolph was confessedly the agent of the complainant both in making and continuing the contract in suit. The state law is made the rule of decision, and under that law his testimony as to matters occurring prior to Mr. Heilman's death is incompetent, and must be disregarded.

On the competent evidence in the case the court is of opinion that the loan was made to the Mackey-Heilman Syndicate, and not to Mackey and the decedent, and that the complainant, after the execution of the note, became a subscriber to the syndicate in the amount of the note, and accepted its pro rata share of the securities in satisfaction of the loan evidenced by the note. But, if the entire testimony of Mr. Randolph were held competent, the court could not reach any other conclusion. The written evidence, coupled with the conduct of the complainant, ought not to be explained away by the uncertain memory of witnesses who speak to matters which death prevents the decedent from contradicting or explaining.

But there is another ground equally fatal to the complainant's right of recovery. Counsel for complainant bottom the bank's right of recovery upon the statute of this state concerning the liability of heirs, devisees, and legatees for ancestral debts. The statute (Rev. St. 1894, § 2465; Rev. St. 1881, § 2310) provides that no action shall be brought by complaint and summons against an executor or administrator for the recovery of any claim against the decedent, but the holder thereof, whether such claim be due or not, shall file a succinct statement thereof in the office of the clerk of the court in which the estate is pending; and, if such claim is filed after the expiration of one year from the giving of notice by the executor or administrator of his appointment, it shall be prosecuted solely at the cost of the claimant, and, if not filed at least thirty days before final settlement of the estate, it shall be barred, except as hereinafter provided in cases of liabilities of heirs, devisees and legatees. The statute (Rev. St. 1894, § 2597; Rev. St. 1881, § 2442) provides:

"That the heirs, devisees and distributees of a decedent shall be liable to the extent of the property received by them from such decedent's estate, to any creditor whose claim remains unpaid, who, six months prior to such final settlement, was insane, an infant, or out of the state; but such suit must be brought within one year after the disability is removed; provided, that suit upon the claim of any creditor out of the state must be brought within two years after such final settlement."

It is insisted that a new right of action is created by the state statute, that it is equitable in its nature, and is enforceable in the national courts of equity to the full extent of the equitable rights thus created. The national courts, upon their equity side, will not only give equitable relief according to the ancient and original jurisdiction of the high court of chancery of England, but will also enforce any new equitable right created by a state statute. The question for solution, then, is this: Has the statute of this state created a new right or liability of an equitable nature against heirs and devisees for ancestral debts unknown to the equity jurisprudence of the national courts? It is undoubtedly true that an action at common law will not lie against an heir or devisee for the recovery of any debt or liability of the ancestor, unless the ancestor has expressly bound himself and his heirs in an instrument under seal, and then only to the extent of assets by descent from the obligor. But the jurisdiction of a court of equity to entertain a bill on behalf of a creditor and all others who may choose to make themselves parties, to charge the heirs and devisees with the payment of the ancestor's debt to the extent of assets by descent, is undoubted. Adams, Eq. (3d Am. Ed.) 570; Story, Eq. Pl. & Prac. §§ 99–102, 106; 2 Beach, Mod. Eq. Jur. §§ 1039, 1040; 2 Woerner, Adm'n, §§ 575, 576; Stratford v. Ritson, 10 Beav. 25; Payson v. Hadduck, 8 Biss. 293, Fed. Cas. No. 10,862; Johnston v. Roe, 1 Fed. 692; Chewett v. Moran, 17 Fed. 820; Riddle v. Mandeville, 5 Cranch, 322; Williams v. Gibbes, 17 How. 238, 254, 255; Public Works v. Columbia College, 17 Wall. 521; Borer v. Chapman, 119 U. S. 587, 7 Sup. Ct. 342.

In Williams v. Gibbes, supra, the supreme court say:

"Now, the principle is well settled, in respect to these proceedings in chancery for the distribution of a common fund among the several parties interested, either on the application of the trustee of the fund, the executor or administrator, legatee, or next of kin, or on the application of any party in interest, that an absent party, who had no notice of the proceedings, and not guilty of willful laches or unreasonable neglect, will not be concluded by the decree of distribution from the assertion of his right by bill or petition against the trustee, executor, or administrator; or, in case they have distributed the fund in pursuance of an order of the court, against the distributees. David v. Frowd, 1 Mylne & K. 200; Greig v. Somerville, 1 Russ. & M. 338; Gillespie v. Alexander, 3 Russ. 130; Sawyer v. Birchmore, 1 Keen, 391; Shine v. Gough, 1 Ball & B. 436; Finley v. Bank, 11 Wheat. 304; Story, Eq. Pl. § 106; Wiswall v. Sampson, 14 How. 52, 67."

The general principle governing courts of equity in proceedings of this description is more clearly stated by Sir John Leach, M. R., in David v. Frowd, supra, than in any other case that has come under my notice. The master of the rolls, in the course of his opinion, observed:

"That if a creditor does not happen to discover the proceedings in the court until after the distribution has been actually made, by the order of the court, amongst the parties having, by the master's report, an apparent title, although the court will protect the administrator who has acted under the orders of the court, yet, upon a bill filed by this creditor against the parties to whom the property has been distributed, the court will, upon proof of no willful default on the part of such creditor, and no want of reasonable diligence on his part, compel the parties defendants to restore to the creditor that which of right belongs to him."

In Public Works v. Columbia College, supra, the supreme court say:

"The jurisdiction of a court of equity to reach the property of a debtor justly applicable to the payment of his debts, even when there is no specific lien on the property, is undoubted. It is a very ancient jurisdiction, but for its exercise the debt must be clear and undisputed, and there must exist some special circumstances requiring the interposition of the court to obtain possession of and apply the property. Unless the suit relate to the estate of a deceased person, the debt must be established by some judicial proceeding, and it must generally be shown that legal means for its collection have been exhausted. In all cases we believe property pledged or conveyed for the payment of the debt must be first applied. The rule requiring the existence of special circumstances bringing the case under some recognized head of equity jurisdiction should not only be insisted upon with rigor whenever the property sought to be reached constitutes, as here, assets of a deceased debtor which have already been subjected to administration and distribution; but some satisfactory excuse should be given for the failure of the creditor to present his claim, in the mode prescribed by law, to the representative of the estate before distribution."

In Borer v. Chapman, supra, Mr. Justice Matthews, speaking for the court, observes:

"Such assets were impressed with a trust which such creditor had a right to have administered for his benefit. It is upon the ground of such a trust that the jurisdiction of courts of equity primarily rests in administration suits, and in creditors' bills brought against administrators or executors, or, after distribution, against legatees, for the purpose of charging them with liability to apply the assets of the decedent to the payment of his debts. As a part of the ancient and original jurisdiction of the courts of equity, it is vested by the constitution of the United States, and the laws of congress in pursuance thereof, in the federal courts, to be administered by the circuit courts in controversies arising between citizens of the different states."

These authorities clearly show that this court is possessed of original and inherent jurisdiction to take cognizance of a suit by a creditor to charge heirs, devisees, and legatees, to the extent of assets taken by descent or devise, with ancestral debts. The state statute created no new right, and this court, in cases of this sort, will administer the law of its own forum as settled by the decisions of the supreme court. It was well said by judge, now Mr. Justice Brown, in Chewett v. Moran, supra:

"The jurisdiction of the federal courts cannot be ousted or impaired by any provision of a state law requiring creditors to appear before a state court, and present their claims."

Hence this court was open to the complainant, while the estate was pending, to prosecute his claim here to final judgment, but when final judgment was obtained it would be satisfied in due course of administration in the state court. The assets of the estate could not be levied upon in the hands of the executor or administrator. Byers v. McAuley, 149 U. S. 608, 13 Sup. Ct. 906.

The complainant, being a nonresident, was not bound to bring its suit here, pending the settlement of the estate, nor to present its claim in the court which had jurisdiction of the settlement of the estate. Such failure is not treated by the supreme court as an absolute bar to its bill, but only as evidence of laches requiring explanation and excuse. As the nonresident creditor is not bound to prove his claim in the court exercising probate jurisdiction over the estate, he is not restricted nor aided by the other provisions of

the act requiring all claims to be prosecuted against the heirs within a limited time. In Johnston v. Roe, supra, it is held that a national court will assume equitable jurisdiction of a suit by a receiver of a bank against the heirs of an estate which had been settled by the decree of the state court having probate jurisdiction to charge such heirs with a debt of the decedent, although the debt was barred by the statute of limitations of the state. In Chewett v. Moran, supra, it was held that it was not a bar to the maintenance of a bill in equity against heirs in a national court that the estate of the ancestor had been administered in the probate court of the state; that commissioners had been appointed to audit claims against the estate; that a time had been limited within which all claims must be proven; and that the complainant had not appeared before such commissioners, nor offered to make proof of the debt, notwithstanding the law of the state declared that all claims against such estate not so presented should be forever barred. It was further held that the failure to present such claim was evidence of laches, and that the burden was on the complainant to excuse the same.

These cases settle the doctrine that the statute of a state prescribing the time within which a suit must be brought against heirs to charge them with an ancestral debt cannot be invoked for their protection in the national courts. If such a statute will not inure to their protection, can it be invoked to charge them with a liability which is barred by laches? The court is of opinion that the state statute neither adds to nor takes from the ancient and original jurisdiction of this court in suits to charge heirs with ancestral debts. The right to maintain such suit depends on the question whether the complainant is chargeable with laches. The failure to present such claim in the court having probate jurisdiction is evidence of negligence which the complainant must excuse before he can recover. See authorities, supra. There is no evidence in this case relieving the complainant from the imputation of laches. The complainant knew of the death of Mr. Heilman within a few days after it occurred. It knew that his estate would be settled in the court of this state having probate jurisdiction over the same. It knew, if its present contention is true, that the estate had more than $100,000 worth of securities that ought to be inventoried and sold subject to complainant's claim. The estate was pending for more than three years before final settlement. These securities, for nearly three years after Mr. Heilman's death, were worth from fifteen to thirty thousand dollars more than the amount of the note. The claim was not presented to the executrix, and its existence was unknown to her and to the heirs. No excuse is offered for this great delay, and no notice was given to any one interested in the estate until the securities had become nearly worthless. It is difficult to find a case of more inexcusable laches, and, in my judgment, a court of equity ought not now to impose the great loss arising from such negligence upon the defendants.

The bill will be dismissed for want of equity, at complainant's costs.