KATHERINE PORTERFIELD, Guardian and Curator of Persons and Estate of DOROTHY PORTERFIELD and BYRON PORTERFIELD, Appellant, v. FARMERS EXCHANGE BANK OF GALLATIN, In Liquidation; S. L. CANTLEY, Commissioner of Finance, JOSEPH N. MARTIN, Deputy Commissioner of Finance, in Charge.—37 S. W. (2d) 936.

Division Two, April 14, 1931.

*Nat G. Cruzen* and *Dudley & Brandom* for appellant.

*Laurance M. Hyde, L. B. Gillihan* and *J. W. Alexander* for respondents.

WESTHUES, C.—In this proceeding Katherine Porterfield, guardian and curator of her minor children, Dorothy and Byron, seeks to impress upon the funds and assets of the defunct bank mentioned in the title a preferred claim in the sum of $20,000. The trial court disallowed the claim *in toto,* either as preferred or general. Plaintiff appealed.

In order to more fully understand the actions of the parties connected with this case, a short history of the matter must be related. Plaintiff's husband, a physician, practicing medicine at Jamesport,

Missouri, and Dr. R. V. Thompson, cashier of the defunct bank, had been on friendly terms for many years, consulting each other frequently with reference to their medical work. Dr. Thompson, according to the evidence, at one time lived at Jamesport and was an officer of the Commercial Bank of Jamesport. Dr. Porterfield also consulted Dr. Thompson on business matters and did his banking business with the Commercial Bank, of which Dr. Thompson was an officer.

Dr. Porterfield was struck and killed by lightning in April, 1921, leaving the plaintiff, his wife, and two small children, Dorothy and Byron, to mourn his unfortunate and untimely death. Dr. Porterfield carried a $10,000 life insurance policy with a double indemnity clause. The children were named beneficiaries in the policy. The plaintiff, after her husband's death, went to Dr. Thompson, who was then cashier of the Farmers Exchange Bank of Gallatin (the bank in liquidation in this case), for the purpose of seeking advice with reference to the estate left by her husband. Dr. Thompson accompanied her to the probate court office and aided plaintiff in having herself appointed guardian and curator for the minor children, and administratrix of her husband's estate. Dr. Thompson signed the bond required by the probate court. The probate judge at that time informed plaintiff and Dr. Thompson that the law required money in the hands of a curator and guardian to be invested in government bonds or first-mortgage real estate securities. Plaintiff then collected the $20,000 from the insurance company and deposited it in the Commercial Bank at Jamesport to her credit as guardian and curator. Sometime later plaintiff went to Gallatin and, while there, met Dr. Thompson on the street. After a short conversation, Dr. Thompson inquired of plaintiff if she had invested that $20,000. Plaintiff informed him that she had not had any experience in real estate loans and did not know just what to do. Dr. Thompson then informed plaintiff that the Farmers Exchange Bank would invest the money for her in good first mortgages; that he was near the court house and could attend to the details without much trouble. Then, by appointment, plaintiff and Thompson met at the probate judge's office in the afternoon of the same day and informed the judge that Dr. Thompson, through the bank, was going to take care of investing the money, collect the interest and do what was necessary to invest the funds. The probate judge again informed them that the funds must be invested in first mortgages on real estate or government bonds. Leaving the probate judge's office, plaintiff and Thompson went to the latter's office at the Farmers Exchange Bank, where plaintiff gave Dr. Thompson, the trusted friend of the family for many years, the following check:

"Jamesport, Missouri, June 10, 1921

Commercial Bank

"Pay R. V. Thompson, Cas. or Bearer          $20,000.00

"Twenty Thousand Dollars.

"R. E. Loans         Katheryn Porterfield, Curator."

The words "R. E. Loans" were written on the check by Dr. Thompson. About the time the check was given, the probate judge came into the bank. According to plaintiff and the probate judge, Thompson made the statement that plaintiff was leaving the money with the bank to be invested, through the bank, in real estate loans, and that that would be done. This was in June, 1921. The bank closed its doors on March 4, 1926. Plaintiff testified that the first time she obtained any knowledge of the fact that no part of the $20,000 had ever been invested in real estate loans was after the bank closed its doors. The annual settlements made by plaintiff as curator and guardian, according to the testimony of plaintiff and the probate judge, are in the handwriting of Dr. Thompson. Plaintiff also testified that Dr. Thompson made out the settlements and accompanied her to the probate office. When the first settlement was made Thompson informed the probate judge that the loans listed in the settlement were secured by first mortgages on real estate. During the summer of 1925, the probate judge inquired of plaintiff what security she had on certain notes. Plaintiff informed the judge that she did not know, but would ask Dr. Thompson. Plaintiff made a notation of these notes and took the list to Dr. Thompson, who informed her that all of the notes mentioned were secured by mortgages on real estate, and enumerated the mortgages the bank held on each individual note.

Witness Mrs. Flora B. Mettle, wife of the probate judge, acted as clerk in the probate office and corroborated the plaintiff as to what transpired at the probate court between plaintiff and Dr. Thompson and the probate judge; also that Dr. Thompson made the first settlement.

Probate Judge Mettle also corroborated plaintiff in her testimony as to the transactions between plaintiff and Dr. Thompson, and as to the statements made by Dr. Thompson with reference to the investment of the money. Witness further testified that Dr. Thompson, on several occasions, informed him that the money was invested in first-mortgage security. The blanks upon which the reports of plaintiff, as guardian and curator, were made, contained a space to list the real estate held by the curator as security for the money invested, as required by Section 418, Revised Statutes 1929. The reports that were made did not contain any description of value of real estate, that part of the reports being left blank. The plaintiff signed and verified the reports. The witness, Judge Mettle, was in office only when the first report was filed, his term having expired

that year. Judge Mettle was cross-examined at length on this subject and asked why he did not require the real estate to be listed. Part of the cross-examination is as follows:

"Q. This is the only report that was filed by Mrs. Porterfield as curator showing money loaned while you were probate judge? A. Yes, sir. My time of office was out that year.

"Q. And did Mrs. Porterfield tell you that these loans were real estate security? A. She didn't know. She was with Dr. Thompson, and Dr. Thompson represented them to be real estate loans.

"Q. You don't know whether they were or not? A. I didn't have no way of checking up on them without going to the Recorder's office, and never did that. . . .

"Q. But you are confident that when you looked over this report and saw that the security wasn't listed, that you told Mrs. Porterfield that it ought to be, and told her that you would require her to have it listed? A. Well, now, Dr. Thompson was spokesman. Mrs. Porterfield didn't—she was there with him, and he was doing the work for her, and she didn't have much to say about it. She didn't know those things, I reckon."

Returning now to 1921, let us see what disposition was made of the check of $20,000 and the proceeds thereof. The evidence is undisputed that the Farmers Exchange Bank gave plaintiff credit for $20,000 on June 10, 1921. The check, however, was deposited by the Farmers Exchange Bank, after it had endorsed the same, in the Fidelity National Bank & Trust Company of Kansas City, Missouri, a correspondent bank, in which bank the Farmers Exchange carried a very active account. Drafts were issued against it and checked out in the ordinary course of business. This account in the Fidelity National was increased to $42,005.37 by the deposit of plaintiff's check of $20,000. The account fluctuated from time to time, as additional money was deposited or drafts drawn against it, up to the time the Farmers Exchange closed its doors, March 4, 1926. On four occasions during that time the account in the Fidelity National was checked out entirely.

Shortly after the bank closed, the plaintiff went to the Deputy Finance Commissioner and made inquiry with reference to her property. She was given a number of notes of various amounts, totaling about $20,000, not one of which was secured by real estate.

The manner in which the account of plaintiff, as curator, was manipulated by the bank is shown by the following, taken from the records of the bank:

"Account of Katherine Porterfield, Curator with
Farmers Exchange Bank of Gallatin, Mo.

| 1921 | Checks | | Deposits |
|------|--------|--------|----------|
| | | Jun 10 | $20,000.00 |
| June 10 | 2,000.00 | 4,000.00 | |

| | |
|---|---|
| Jun 13 | 2,000.00 |
| Jun 14 | 2,000.00 |
| Jun 18 | 4,500.00 |
| Jun 23 | 1,000.00 |
| Jun 28 | 1,000.00 |
| Jul 7 | 2,000.00 |
| Jul 12 | 500.00 |
| Jul 14 | 1,000.00'' |

The checks were in reality debit slips issued by the bank and charged to the account of plaintiff, of which the following are samples:

"6-10-21  Debit Slip Bert M. Barnett note          $2,000.00
"6-10-21  Debit Slip Pettijohn F. Co. note          4,000.00"

It will be noticed that the debit slips issued on or before July 14, 1921, amounted to $20,000. We infer from the record that the bank continued to issue debit slips at various times up to and including July 7, 1925. This seems to have been done by taking notes from plaintiff's envelope and crediting her account with the amount of the notes and then taking some other note or notes from the bank's assets and charging plaintiff's account with the amount of that note or notes and issuing a debit slip for a like amount. The interest supposed to have been collected on these notes should have been placed to plaintiff's credit. It is admitted that the notes delivered to plaintiff after the bank closed were absolutely worthless, by reason of the hopeless insolvency of the makers. Plaintiff made an effort, but failed, to collect one cent on these notes. A number of the makers renewed the notes to plaintiff as curator. Plaintiff also obtained a judgment on several of the notes, and had execution issued, without results. At the trial plaintiff offered to return all of the notes and the renewals and whatever she received from the bank to the bank commissioner.

Prior to the failure of the Farmers Exchange Bank plaintiff issued a number of checks on the bank against a fund supposed to represent interest collected on the real estate loans. The first check was drawn April 17, 1924. These checks, eight in number, were in payment of plaintiff's allowance as guardian and curator and probate court fees. The total amount of these checks was $2,009.76. When the bank closed, plaintiff's account, as curator, showed a balance of $1,481.46. This amount was allowed as a general claim. It is supposed to represent interest collected.

In order to determine the issues in this case, it is necessary to relate and state the condition of the defunct Farmers Exchange Bank. We will attempt to condense this statement as much as the circumstances permit. The condition of the bank is reflected in the daily statements offered in evidence, of which the following are samples:

|  | "3-2-20 | 6-10-21 | 5-12-23 |
|---|---|---|---|
| "Due from other banks | $150,876.58 | 103,151.03 | 73,651.38 |
| County Warrants |  |  | 61.25 |
| Cash in Vaults | 27,803.72 | 15,998.51 | 13,180.55 |
| Banking House | 12,000.00 | 12,000.00 | 12,000.00 |
| Furniture & Fixtures | 3,000.00 | 3,000.00 | 4,975.00 |
| Bonds | 9,950.00 | 11,150.00 | 21,341.71 |
| Overdrafts | 44,320.07 | 8,179.24 | 8,234.17 |
| Bills Receivable | 834,790.11 | 700,091.64 | 771,554.50 |
| Other Real Estate | 8,000.00 | 1,400.00 | 28,750.00 |
| Bonds Borrowed |  | 30,300.00 | 20,000.00 |
| Stocks |  |  | 2,000.00 |
| Other Resources |  |  | 43,107.65 |
| War Savings Stamps | 77.99 |  | 85.40 |
| Cont. Guaranty Corp | 3,560.48 |  |  |
|  | $1,094,378.95 | 885,270.42 | 998,941.61 |
| "Capital | 50,000.00 | 50,000.00 | 50,000.00 |
| Surplus | 60,000.00 | 60,000.00 | 60,000.00 |
| Undivided Profits | 26,924.04 | 23,862.32 | 19,498.74 |
| Time Deposits | 60,869.90 | 112,633.68 | 77,447.28 |
| Demand Deposits | 824,422.19 | 457,724.87 | 573,225.12 |
| Savings Deposits |  |  | 16,534.79 |
| Other Bank Deposits | 47,482.82 | 40,493.87 | 58,385.68 |
| Bills Payable | 21,900.00 | 103,034.72 | 62,000.00 |
| Rediscounts |  |  |  |
| Bonds Borrowed |  | 30,300.00 | 20,000.00 |
| Due War Finance Corp. |  |  | 60,000.00 |
| Cashiers Checks | 2,780.00 | 7,220.96 | 1,850.00 |
| Bonds sold with agreement to repurchase |  |  |  |
|  | $1,094,378.95 | 885,270.42 | 998,941.61 |
|  | "1-10-24 | 1-28-26 | 2-25-26 |
| "Due from other Banks | $ 134,717.71 | 73,621.52 | 20,478.41 |
| County Warrants |  | 32,834.59 | 32,834.59 |
| Cash in Vaults | 17,112.27 | 14,790.22 | 17,823.22 |
| Banking House | 12,000.00 | 12,000.00 | 12,000.00 |
| Furniture & Fixtures | 4,975.00 | 4,975.00 | 4,975.00 |
| Bonds | 11,197.69 | 584.96 | 1,151.26 |
| Overdrafts | 9,116.40 | 4,303.93 | 9,554.99 |
| Bills Receivable | 826,066.37 | 788,953.61 | 800,821.76 |
| Other Real Estate | 28,750.00 | 20,600.00 | 24,600.00 |
| Bonds Borrowed | 20,000.00 | 19,000.00 | 19,000.00 |
| Stocks | 2,000.00 | 2,000.00 | 2,000.00 |
| Other Resources | 43,107.65 |  |  |

War Savings Stamps
Cont. Guaranty Corp.

| | | | |
|---|---|---|---|
| Total | $1,109,043.09 | 973,663.83 | 945,239.23 |
| "Capital | 50,000.00 | 50,000.00 | 50,000.00 |
| Surplus | 60,000.00 | 60,000.00 | 60,000.00 |
| Undivided Profits | 13,190.73 | 4,146.45 | 4,311.61 |
| Time Deposits | 98,803.44 | 69,404.27 | 68,267.20 |
| Demand Deposits | 640,178.09 | 484,236.58 | 465,669.08 |
| Savings Deposits | 21,399.75 | 30,282.86 | 53,817.73 |
| Other Bank Deposits | 99,840.13 | 60,596.16 | 30,576.20 |
| Bills Payable | 79,202.96 | 195,997.41 | 193,597.41 |
| Rediscounts | 26,127.99 | | |
| Bonds Borrowed | 20,000.00 | 19,000.00 | 19,000.00 |
| Due War Finance Corp. | | | |
| Cashiers Checks | 300.00 | | |
| | $1,109,043.00 | 973,663.83 | 945,239.23" |

The actual condition of the bank on March 4, 1926, as found by the bank examiners, is as follows:

| | |
|---|---|
| "Loans and discounts, personal or collateral............ | $728,079.07 |
| Loan, Real Estate.................................... | 58,465.74 |
| Daviess County Warrants............................ | 31,566.54 |
| Overdrafts ........................................ | 9,763.72 |
| U. S. Liberty Bonds, belonging to bank.............. | 434.26 |
| Real Estate Banking House.......................... | 12,000.00 |
| Furniture and Fixtures.............................. | 4,975.00 |
| Due from Banks.................................... | 23,272.88 |
| Cash ............................................. | 4,078.15 |
| Cash items ....................................... | 2,813.55 |
| Bonds Borrowed .................................. | 19,000.00 |
| Other Real Estate................................. | 24,600.00 |
| Stocks—Sixteen Shares Farmers Bank, Jameson, Mo.... | 2,000.00 |
| Cash short ....................................... | 23.47 |
| Shortage in account with Fidelity National & Trust Co. K. C. Mo. ....................................... | 3,000.00 |
| Loans short ..................................... | 1,658.87 |
| Bills Payable, more than they show on their books...... | 10,960.20 |
| Total Resources................... | $936,691.45 |

## "LIABILITIES

| | |
|---|---|
| "Capital ........................................ | $ 50,000.00 |
| Surplus ......................................... | 60,000.00 |
| Undivided Profits, Net ........................... | 3,145.23 |
| Time Deposits .................................... | 67,267.20 |
| Individual Deposits .............................. | 438,727.85 |

| | |
|---|---|
| Due to Banks | 48,997.92 |
| Bills Payable | 219,557.61 |
| Bonds Borrowed | 19,000.00 |
| Savings Accounts | 29,995.31 |
| Daviess County Warrants, Long | 100.31 |
| Individual deposits, Short | .20 |
| "Total Liabilities | $936,691.45 |

R. E. SHELBY,
State Bank Examiner in Charge."

Only $4,000 was collected on the item of $23,272.88, due from other banks. The balance was retained by the banks having the deposit and applied to the indebtedness of the Farmers Exchange. It may be noted here that no part of the $4,000 collected was from the Fidelity National. Notes aggregating over $300,000 were held as collateral by other banks and sold by these banks, the proceeds being applied on the indebtedness of the Farmers Exchange. The commissioner received notes and loans aggregating $481,187.88. Of this amount the commissioner collected $106,443.07. It is estimated that not more than $20,000 additional will be collected, the balance being worthless. The loans on which the collections were made originated during the years 1917 to 1926, inclusive. The commissioner also collected from overdrafts, United States Bonds and the sale of the banking house and fixtures, a total of $17,806.22; cash items, $1,682.56; real estate, $3,582.50; from the bonds of the president and cashier, $2500; cash in vault $4,078.15, making a total of all collections of $140,092.50. The commissioner in charge estimates the amount that probably will be collected out of the remaining assets to be approximately $30,000. This means that the commissioner will have about $170,000 to pay the costs of administration and distribute among the creditors. However, approximately $160,000 has been realized on the notes aggregating $303,689.06 held by city banks as collateral. The banks holding these notes collected that sum and have given the commissioner credit for the amounts collected, reducing the indebtedness of the Farmers Exchange by that sum.

Respondents filed an additional abstract of the record, insisting that the facts therein detailed are material to the issues in the case. In addition to those we have embodied in our statement, we quote from respondent's abstract, the following:

"It was further shown in evidence, conceded and admitted, that on May 12, 1923, the bank obtained $115,000 of new assets by taking over the Gallatin Trust Company. During the last year of its operation it borrowed from its city correspondents the sum of $120,000 additional. It obtained over $200,000 through building and loan mortgages, which it placed upon its own real estate, and from the sale of its notes to its customers."

The additional abstract of the record also discloses that the court allowed as general claims an amount aggregating $487,952.85. It disallowed preferred claims filed in the sum of $246,788.18. The amount of preferred claims allowed was $22,264.65.

Pursuant to an agreement by the attorneys representing the defunct bank or the bank commissioner and the attorneys representing the various claimants, the circuit court heard all of the disputes as to the allowance of claims in one proceeding, and all evidence taken during this hearing was to be considered by the court as applicable, so far as the same was competent, relevant and material, to each and all of the claims presented for allowance.

Additional facts will be stated in the course of the opinion, if deemed necessary.

The assignments of error in appellant's brief are as follows:

"The court erred in refusing to allow the claim of plaintiff, Katherine Porterfield, as a preferred claim.

"The court erred in refusing to allow the claim of Katherine Porterfield as a common claim."

The order of the court does not specify upon what ground the claim was denied. The respondents contend that the decree appealed from herein is not merely a judgment on appellant's claim, but that, by reason of the agreement of the attorneys referred to in the statement, the decree is an equitable separation of the property and assets of the bank among all of the claimants; that this appeal then is to modify that portion of the decree affecting appellant's claim. We interpret the agreement merely to mean, that, in the interest of time and labor, all the evidence be submitted to the court in one proceeding; that any and all evidence adduced should be considered by the court, in so far as competent, material and relevant, in support of or against any claim presented at this hearing. Except for the agreement, much of the testimony would have to have been offered separately as to each claim, requiring much useless time and labor. Agreements of this nature are commendable and should be encouraged. Courts, therefore, should place a liberal construction upon such procedure and not deny any right to the litigants not expressly surrendered. We will therefore treat the appeal not as asking for a modification of the decree on all of the claims, but as an appeal from a separate judgment against plaintiff, to be affirmed, reversed or modified, as we deem proper, as though it were a separate suit.

Another theory advanced by respondent is that plaintiff as guardian and curator ratified and affirmed the actions of the bank, and therefore the relation of debtor and creditor existed; also, that plaintiff ratified the conduct of the bank of investing the money of the wards in worthless notes,

In approaching this question, we must keep in mind that the plaintiff in this action is not dealing with her own property, but she stands before the court in a representative capacity of guardian and curator for minor children. In this capacity plaintiff has certain duties to perform, by virtue of the mandate of the Missouri statute. Failing in these duties, a guardian is subject to removal by the probate court. Section 418, Revised Statutes 1929, provides in part, as follows:

"Guardians and curators shall, unless the money be invested in improving the real estate of the wards as hereinafter provided, loan the money of their wards at the highest legal rate of interest that can be obtained, on prime real estate security, or invest it in bonds of the United States, or of the State of Missouri, or of the federal farm loan bank except where the estate is less than three hundred dollars, in which case good personal security may be taken, and shall account for all such interest received, which shall be charged in their annual settlements. . . . "

It was therefore the duty of plaintiff to invest the funds in question in the manner provided by the section of the statute quoted. The bank and Dr. Thompson were charged with knowledge of this provision. Dr. Thompson as cashier of the bank had personal knowledge that the funds in question were the property of minor children. Thus, with full knowledge of the situation, Dr. Thompson, as cashier, proposed to plaintiff that the bank invest the funds as the statute provided, to-wit, on prime real estate security. The plaintiff issued the check to Dr. Thompson, as cashier, with that understanding. Dr. Thompson assured plaintiff and the probate court that the funds had been so invested. There is no evidence whatever that plaintiff at any time prior to the closing of the bank knew that the funds had not been so invested. The fact that plaintiff drew checks on the bank is of little consequence. The first check was not issued until 1924. The interest that should have been collected on the funds far exceeded the amount of the checks. As late as 1925, at the suggestion of the probate court, plaintiff inquired of Dr. Thompson what security was being held on certain notes. Dr. Thompson at that time told plaintiff the particular security held on each note. True, this information was false. Plaintiff, however, inexperienced as the evidence discloses her to be in business matters, did not suspect anything wrong. We therefore rule, that even if plaintiff were dealing with her own property, there was no ratification of the transaction prior to the closing of the bank. Ratification has been defined in law to be "the approval by act, word, or conduct, of that which was attempted (of accomplishment) but which was improperly or unauthorizedly performed in the first instance." [33 Cyc. 1529.] Also: "The acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances, is a ratification." [33 Cyc. 1529, note 28.]

A short time after the Finance Commissioner had taken charge of the bank's assets, plaintiff called for her property as guardian and curator. The deputy commissioner in charge delivered to plaintiff ▮▮▮▮▮ an envelope containing notes aggregating $20,000 or more, with the comment, "They are not worth a dime." This, according to the evidence, is the first information plaintiff had received that the funds of her wards had not been invested in real estate security. Respondents insist that plaintiff, with this information, waived any right she might have had by accepting the notes, receipting therefor, calling on the makers for payment and taking renewals on a number of the notes and obtaining judgment and having execution issued. At the trial plaintiff offered to return all she had received to the Finance Commissioner. If plaintiff were dealing with her own property, we would be confronted with the question of whether or not plaintiff, by her conduct, ratified the actions of the bank. Not so, however, when plaintiff is acting as guardian and curator, as we shall presently see. Section 418, above quoted, speaks in no uncertain terms with reference to the manner in which the funds in the hands of a guardian and curator must be invested. If funds are otherwise invested, except as provided by statute, it is unlawful. Even the probate court cannot legally authorize the investment of such funds, except as prescribed. Therefore, the action of the bank, with full knowledge of the situation in this case, in taking the money of the wards and attempting to give the guardian and curator worthless notes in lieu thereof, was not only a violation of the bank's agreement, but was contrary to the provisions of the statute referred to. Such conduct of a third person in dealing with property of a ward cannot be ratified by the guardian and curator on behalf of the ward. Plaintiff had no power or authority to waive any right the wards may have had against the bank or the Finance Commissioner. She was legally bound to exhaust every legal remedy available to redeem the wards' property. A guardian's authority does not extend to the doing of any act detrimental to the ward. [28 C. J. 1125, sec. 210, and cases cited; Stockyards National Bank of South Omaha v. Bragg et al. (Utah), 245 Pac. 966; Johnson v. Bank, 56 Mo. App. 257; Horine v. Horine & Funk, 11 Mo. 649, 1. c. 653; Naeglin v. DeCordoba, 171 U. S. 638.] We rule, therefore, that the guardian did not by her conduct ratify the unauthorized acts of the bank in question, but rather, that it was her duty to take every step reasonably necessary to preserve her wards' estate.

We now come to the serious question in the case. In order for ▮▮▮▮▮▮ appellant to be entitled to a preference, we must find: first, that the liability or relation created on the part of the bank was that of a trustee and *cestui que trust* and not that of a debtor and creditor; second, that the trust

fund swelled the assets of the bank and as such came into the possession of the Finance Commissioner.

As to the first, enough has been said that unquestionably the relation of trustee and *cestui que trust* existed. This is not seriously denied by respondents. As to the second, the respondents insist that the evidence conclusively discloses that the entire fund in question had been dissipated by the bank as trustee and no part reached the Finance Commissioner; that therefore a preferred claim cannot be allowed. The contest is between the general creditors and the claimant of a preferred claim. The general creditors are entitled to all of the assets belonging to the debtor. The preferred claimant, in order to impress his claim, must show that his property or money was held in trust by the debtor; that in justice it should be returned and that in reality it does not form a part of the assets of the debtor's estate. Therefore, no injustice is done the general creditors by returning claimant's property. The rule followed in Missouri does not require that the identical property or thing be pointed out in order for plaintiff to be entitled to a preferred claim. But, if he can show that his property has been commingled with the property of the trustee, that it has enhanced the assets of the trustee, and that the Finance Commissioner came into possession of assets so enriched, by reason of the transaction that brought plaintiff's property into the hands of the trustee, then plaintiff is entitled to a preference. This is undoubtedly based on sound reason and justice. [Horigan Realty Co. v. Flynn, 213 Mo. App. 591, 253 S. W. 403; Nichols v. Bank of Syracuse (Mo. App.), 278 S. W. 794; Thompson v. Bank of Syracuse (Mo. App.), 278 S. W. 810; Evangelical Synod of North America v. Schoeneich, 143 Mo. 652, 45 S. W. 647; State ex rel. Attorney-General v. Page Bank, 322 Mo. 29, l. c. 36, 14 S. W. (2d) 597; Consolidated School District v. Citizens Bank (Mo. App.), 21 S. W. (2d) 781; Huntsville Trust Co. v. Noel (Mo. Sup.), 12 S. W. (2d) 751; In re Linn County Bank (Mo. App.), 1 S. W. (2d) 206; Mann v. Bank of Greenfield (Mo. Sup.), 20 S. W. (2d) 502, l. c. 507; Schulz v. Bank of Harrisonville, 246 S. W. 614; National Bank v. Insurance Co., 104 U. S. 54, l. c. 68, 69; Pearson v. Haydel, 90 Mo. App. 253, l. c. 262, 263; Midland National Bank v. Brightwell, 148 Mo. 358, 49 S. W. l. c. 995.]

We will now analyze the transaction between plaintiff, as guardian, and the bank, and see whether the bank's assets were enhanced by the $20,000 in question, and, also, whether or not the assets so enriched passed into the hands of the Finance Commissioner. The bank received the $20,000 check, not as a general deposit, but for a special purpose—that of investing the funds in real estate loans. Its duty, therefore, was to collect the amount and invest the funds as agreed. When the bank received the check it endorsed the same and gave plaintiff credit for the $20,000 as a general deposit. The bank, by

that action, made the check its own and so treated it by sending the check to the Fidelity National to be credited to the Farmers Exchange account. The bank then proceeded to issue debit slips against the general deposit in its own bank and charge plaintiff's account therewith by placing worthless notes in an envelope for plaintiff, until the entire fund was exhausted. This conversion was completed within thirty days. The record discloses that during this period the Farmers Exchange Bank drew drafts against the Fidelity National, the total of which far exceeded $20,000. In the ordinary course of business a bank receives cash, or its equivalent, for drafts issued to its customers drawn on its correspondent banks. The financial condition of the bank was bettered by having $20,000 more cash and $20,000 less worthless notes. If any notes of value were originally placed in plaintiff's envelope, they were extracted and replaced with notes that were worthless, since all agree that the notes plaintiff received were of that nature. That being true, it matters little how we figure the transaction. The ultimate result is the same. The Farmers Exchange had $20,000 to which it was not entitled, and for which it gave nothing. After a careful consideration of this matter from all angles, we are forced to the conclusion that if it had not been for this $20,000 the Finance Commissioner would have received $20,000 less in assets, and the worthless notes received by him would have aggregated $20,000 more.

The comment by the Kansas City Court of Appeals on this subject in Nichols v. Bank of Syracuse, 278 S. W. 1. c. 797, which is discussed at length by respondents in their brief, we think especially applies in this case, where the court said:

"When all of the money arising from general deposits and from the receipt of a trust fund goes into one general mass, and is used in the general business of the bank, as was done in this case, then the whole assets of the bank are subject to a lien in favor of the *cestui que trust*. In order to have a dissipation of the trust fund, it must be shown either that that fund can be traced specifically, and that it has been dissipated, *without augmenting the funds of the trustee*, or that the general fund with which the trust fund was wrongfully mingled has all been dissipated, and the entire estate of the insolvent trustee has arisen from other sources. . . ." (Italics ours.)

In discussing this and other similar cases, respondents apparently have overlooked the clause italicized. The preferred claim allowed in the Nichols case exceeded the total cash in the bank's vault and the cash to its credit in other banks. It seems to the writer that to deny plaintiff's claim as preferred, we must overrule the case of Evangelical Synod v. Schoeneich, supra. In that case plaintiff was allowed a preferred claim in the sum of $3,000. The evidence

conclusively discloses that the trust fund had been deposited in the Union Savings Bank, by the trustee, with its own funds. When the partnership (trustee) dissolved, it was insolvent and paid only twenty per cent to its general creditors. The amount on deposit in the Union Savings Bank was only $15.92, the balance having been paid out in the ordinary course of business. Yet this court allowed the preferred claim on the theory that the partnership property was benefited by the use of the money of plaintiff and therefore the general creditors were not hurt by allowing plaintiff's preferred claim. We find the same situation in the following cases: Nichols v. Bank of Syracuse, supra; Thompson v. Bank of Syracuse, 278 S. W. 813, par. 7; Horigan Realty Co. v. Flynn, supra; Johnson v. Farmers' Bank of Clarksdale, 11 S. W. (2d) 1090, l. c. 1092. The Schoeneich case, supra, has been cited with approval in the following late cases: In re Linn County Bank, 1 S. W. (2d) 206, 222 Mo. App. 84; State ex rel. Attorney-General v. Page Bank of St. Louis County, 14 S. W. (2d) 597, 322 Mo. 29, l. c. 36; Consolidated School District v. Citizens Savings Bank, 21 S. W. (2d) 781. We are justified in finding from the record in the case now before us that plaintiff's $20,000 check in question was utilized by the Farmers Exchange Bank, in violation of its trust, by depositing it in the Fidelity National and selling drafts to its customers drawn against that fund, and that thereby the Farmers Exchange received the full benefit of the fund.

We think the cases cited above fully answer the other contention made by respondents, that the assets which passed into the hands of the Finance Commissioner arose from other sources than the trust fund. We do not so understand the record. It is true, as contended by respondents, that the defunct bank borrowed from city banks, during the last year of its existence, $120,000. This was probably used to pay its debts. The record also discloses that these city banks realized $160,000 on the collateral held by them as security. The $115,000 assets received by the Farmers Exchange Bank in taking over the Gallatin Trust Company were also accompanied by liabilities. There is no showing whatever that the bulk of the assets received by the Finance Commissioner arose by virtue of these transactions. The evidence discloses that the bills receivable constituted the largest item of the bank's assets from 1920 to the day it closed its doors. This item was in excess of $750,000 when the Finance Commissioner took over the bank.

Under the facts disclosed by the record and the authorities cited, we have reached the conclusion that plaintiff, as guardian and curator, is entitled to a preferred claim, on the theory that the wards' property or trust funds swelled the assets of the bank and that the assets so enriched passed to the Finance Commissioner.

We therefore reverse the judgment of the circuit court, with in-

structions to allow plaintiff's claim as preferred, in the sum of $20,000. It is so ordered. *Davis* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. *White, P. J.,* and *Henwood, J.,* concur; *Ellison, J.,* not sitting.