HORACE H. HAGAN and EUGENE HAGAN, Appellants, v. MARY J. LANTRY and HELEN LANTRY DALY.—89 S. W. (2d) 522.

Division One, December 18, 1935.

162

*Cooper, Neel, Kemp & Sutherland* and *Horace H. Hagan* for appellants.

*Johnson, Lucas, Landon, Graves & Fane* for respondents.

FERGUSON, C.—This is an equity suit originally brought by W. G. Hagar, guardian of Eulilia Hagan, Virginia Hagan, Horace H. Hagan and Eugene Hagan (brothers and sisters), minors, to establish and declare a trust in certain partnership assets and property of the firm of B. Lantry Sons, or the proceeds thereof, in favor of said minors. The minors, the real parties in interest, were at all times residents of Logan County in the Territory and State of Oklahoma and in 1903 W. G. Hagar was duly appointed "Guardian of the persons and estate" of said minors by the Probate Court of Logan County in the then Territory of Oklahoma. This suit was instituted in the Circuit Court of Jackson County. The guardian, Hagar, died before the trial of the cause and thereupon, each of the wards having attained majority the suit was revived in their names as plaintiffs. At the trial of the cause it developed that subsequent to the revivor and prior to the trial each of the sisters Eulilia Hagan and Virginia Hagan had been paid her full share of the estate and they withdrew as plaintiffs leaving the brothers Horace H. Hagan and Eugene Hagan as parties plaintiffs. On a trial, in the Circuit Court of Jackson County, the chancellor found for the defendants and plaintiffs have appealed from the judgment entered.

We are of the opinion that it will facilitate the presentation and discussion of the pleadings and issues involved, and an understanding of the theory of the suit, if we first undertake a statement of facts, attempting something of a chronological arrangement and history of the various transactions. The estate of the Hagan children, minors, residents of Oklahoma, was administered in the Probate Court of Logan County, Oklahoma. As stated, Hagar, who was their first cousin, was duly appointed, in 1903, by that court, as guardian of their "persons and estates." Two brothers Charles J. Lantry and Henry E. Lantry composed a partnership doing business under the firm name of B. Lantry Sons. The two Lantrys as a partnership, under the firm name, operated on a large scale in both "railroad contracting and farming." In their contracting business they engaged in railroad construction work "dirt work, stonework, ballasting and general railroad work." In that connection they operated "stores" or "commissaries on their works" at which they sold merchandise and supplies to their employees at a profit of "twenty-five to fifty per cent." The number of these stores in operation, at any one time, varied from "two to ten." They carried on railroad construction work at various points in Arizona, California, Illinois, Iowa, New Mexico, Texas and Kansas and owned a large amount of machinery,

tools and equipment used in their construction work. They owned and operated a large ranch or farm of several thousand acres, near Strong City, Kansas, which was stocked with horses, mules, cattle and hogs, also farming implements and machinery. It seems they also owned other farm lands and real estate in Kansas, Iowa, Wisconsin, Illinois and Texas. In carrying on their various enterprises the Lantrys borrowed money from time to time. The record indicates that the Lantrys were residents of the State of Kansas. Their "main office" was at Strong City, Kansas. They also maintained an office at Kansas City, Kansas. One Eugene Hagan (not the party plaintiff herein) an uncle of the Hagan children, and also the uncle of Hagar, their guardian, was an attorney and resident of Topeka, Kansas. From his letters, in evidence, he appears to have been attorney for the Lantrys. One witness described him as an "intimate friend" of Charles J. Lantry. Anyway Attorney Hagan in Topeka, acting on the part of the Lantrys, and in good faith, seems to have initiated and carried on negotiations between the guardian Hagar in Oklahoma and the Lantrys in Kansas relative to a loan from the minors' estate of $20,000 to the Lantry partnership and to have recommended and attended to the details thereof. Hagar as guardian arranged to make the loan and, apparently pursuant to Hagan's direction, sent a check in that amount, by mail, to Hagan at Topeka, Kansas. The check was made payable to "C. J. Lantry." Acknowledging receipt of the check Hagan advises Hagar that he is attorney "for the outfit," clearly meaning the Lantry partnership doing business under the firm of B. Lantry Sons, and states: "I cannot conceive anyway on earth that this money could be lost. I regard it much safer than I would in the bank. . . . My best judgment is . . . that they have in money first mortgage bonds and in other property of absolute fixed value more than one million dollars above any liability. They have thirteen thousand acres of land in their ranch that there is not a penny against . . . if there is ever any question about their liability I would be the first man to reach for this money for these children." Attorney Hagan delivered the check and a promissory note for $20,000 was executed and forwarded to Hagar, at Guthrie, Oklahoma, together with 96 shares of bank stock as collateral security therefor. The note was as follows:

"Guthrie, O. T., June 17, 1903.

"On demand after one year from the date hereof, we promise to pay to the order of W. G. Hagar, Guardian of Eulilia Hagan, Virginia Hagan, Horace H. Hagan and Eugene Hagan, minors, the sum of twenty thousand dollars ($20,000.00), at the City of Guthrie, in the Territory of Oklahoma, with interest at the rate of seven per cent per annum, payable semi-annually.

"This note is given for a full and valuable consideration, and is

secured by 96 shares of stock of the First National Bank of Topeka, Kansas, which have this day been assigned to the said W. G. Hagar and is delivered with this note as collateral security for the payment of the same.

"B. Lantry Sons by
"Chas. J. Lantry.
"Chas. J. Lantry."

The parties hereto agree that the note is an Oklahoma contract. We digress here to observe that there seems little, if any, room for doubt, that this note created and was a binding partnership obligation. Somewhere in the course of the printed argument respondents (defendants below) suggest, in effect, that it was not distinctly or directly shown that Henry E. Lantry who died some ten months after the execution of this note ever had actual knowledge of or acquiesced in its execution. It does appear, however, that Henry E. Lantry acknowledged and recognized liability on other notes executed by Charles J. Lantry in the partnership name and signed in exactly the same way this note was signed. Further the showing made as to the nature of the partnership business, the manner in which same was conducted, and the borrowing of money in connection therewith was such as to imply authority on the part of Charles J. Lantry to sign the firm name and negotiate its notes and thereby create an obligation on the part of the partnership. However respondents apparently do not seriously stress such contention and we have perhaps given it more attention than it requires. We shall therefore consider and treat the note as being the obligation of the partnership of B. Lantry Sons. In November, 1903, by bills of sale and warranty deeds Charles J. Lantry transferred and conveyed his undivided one-half interest in the property and assets "owned and controlled by B. Lantry Sons" to Henry E. Lantry who thereby became the sole owner of said property both personal and real. These instruments were filed for record. No notice of dissolution of the partnership was given and the various business enterprises formerly carried on in the firm name of B. Lantry Sons were continued in that name; Charles J. Lantry continuing "in the active management except" as to "finances." Henry E. Lantry died, testate, in Chase County, Kansas, April 20, 1904, leaving surviving him his widow, defendant herein Mary J. Lantry, a daughter the defendant herein Helen Lantry Daly, and a minor son Fred J. Lantry who died shortly after his father's death. The writer does not recall that the evidence discloses the date of the son's death but both parties refer to that fact and we have stated it as it is set out in the statements. The widow, defendant herein, Mary J. Lantry, was duly appointed executrix of the estate by the Probate Court of Chase County, Kansas. As executrix she gave all the statutory

notices, made final settlement and on September 25, 1905, was discharged by the probate court. The guardian Hagar, by deposition, testified that he had no knowledge or information at the time of the transfer by Charles J. Lantry of his interest in the partnership property to Henry E. Lantry or the death of Henry E. Lantry and the administration of his estate in the Probate Court of Chase County, Kansas; that he did not know Henry E. Lantry; that all his dealings and correspondence after the loan was made, in reference thereto, was with Charles J. Lantry and that he received interest payments from Charles J. Lantry up to January 5, 1910; and that he did not learn of the death of Henry E. Lantry until 1913. The note was not filed nor any claim thereon made against the estate of Henry E. Lantry in the Probate Court of Chase County, Kansas. This suit was filed in 1914. It does not appear from the evidence in the record before us but from the statements and briefs it does appear, and is treated as a fact, that under the will of Henry E. Lantry his entire estate went to his widow, son and daughter, though the portion or share of each therein is not shown. It seems that the son and daughter were at that time minors and the mother, Mary J. Lantry was appointed as their guardian by the Probate Court of Chase County, Kansas. By contract and deeds executed pursuant thereto Mary J. Lantry personally and as guardian sold and conveyed to Charles J. Lantry "all the real estate" and "personal property" "formerly owned by B. Lantry Sons, a firm consisting of H. E. Lantry and Charles J. Lantry who were at one time copartners." Charles J. Lantry agreed to assume and pay all debts, "assume the completion and fulfillment of any and all contracts existing on the part of said Henry E. Lantry" and pay $275,000 of which $20,000 was paid in cash, the remainder of $255,000 to be paid in installments and secured by mortgages on the property. This deal was completed on October 5, 1904. On January 5, 1906, Charles J. Lantry paid $10,000 on the principal of the note to Hagar, guardian, and the note was credited accordingly. On July 10, 1906, Charles J. Lantry transferred and conveyed the former partnership property and assets which he had purchased from Mary J. Lantry and Mary J. Lantry, guardian, to F. W. Freeman of Shawnee County, Kansas, subject to the purchase price mortgages thereon, also other property, in trust, to secure and pay debts owing to individuals, banks and trust companies named in the order of preference therein set out. Those named in the last class for payment pro rata are: "claims of the Merchants National Bank of Topeka, Kansas, and Eugene Hagan, of Topeka, Kansas." The instrument does not contain any stipulation or provision for release or discharge of debts for less than full amount thereof. The instrument does not specifically mention the note to Hagar, guardian, but defendants say that by the

reference to a claim of Eugene Hagan of Topeka, Kansas, the note to Hagar, guardian, was intended. However there is confusion in the evidence about that. Until sometime in 1908 the trustee was under the impression this reference to a claim of Eugene Hagan, the Topeka attorney, applied to a note held by Hagan's mother-in-law, whom Hagan represented, and to whom he made certain payments thereon. However in 1911 and again in 1914 the trustee made payments on interest on the note to Hagar, guardian. The trustee testified that the trust deed or deed of assignment was never recorded "because we did not want to embarrass him (Charles J. Lantry). The title of record remained in Mr. Lantry to most of the property and he deeded several of them and transferred the proceeds to me. Later circumstances changed and I took over the titles." Apparently the guardian, Hagar, did not know of this assignment nor learn of it until sometime in 1908. It will be remembered that Charles J. Lantry executed the trust conveyance July 10, 1906. On February 27, 1907, Freeman, the trustee named therein, paid Mary J. Lantry the balance of the purchase price of the property secured by mortgages thereon, $255,000 with accrued interest to date, and the mortgages were released as of that date. Presumably this money was derived from a sale of the property or a part thereof and thereby the former partnership property and assets of B. Lantry Sons was converted into money and in that form, in the total amount of $275,000 and interest, was paid to and received by Mary J. Lantry and Mary J. Lantry, guardian. It is conceded that due to the death of Fred J. Lantry, Mary J. Lantry and Helen Lantry (Daly), the defendants herein, were the ultimate recipients of the entire purchase money of $275,000. Charles J. Lantry died, insolvent, in 1912. It will be recalled that the $20,000 note to Hagar, guardian, dated June 17, 1903, became due "on demand after one year from date." There was evidence that in June, 1904, the stock of the First National Bank of Topeka, ninety-six shares of which had been deposited with Hagar as security for the note, had a value of "between $125 and $150 a share." In July, 1905, the bank failed and the stock became and has since been "worthless." It seems that shortly thereafter Hagar wrote to his uncle, Attorney Hagan, of Topeka, Kansas, who was also the uncle of the minor wards, about the collateral. Replying thereto Attorney Hagan wrote:

"Some time ago you sent me some stock you held as collateral to secure the Lantry note. . . . The bank stock is now absolutely worthless and he (Charles J. Lantry) will either have to substitute new security or I will call this money in. As far as the notes are concerned, I will simply say that he himself (Charles J. Lantry) is abundantly liable, and in addition to that the estate of B. Lantry Sons is on it, which invoices several hundred thousand dollars, so

there need be no worry on that account. But nevertheless I want to keep it beyond any question, as it is trust money."

This letter was dated August 18, 1905, and was after the death of Henry E. Lantry and shortly before the final settlement and discharge of the executrix of the estate. Apparently the reference to an estate of B. Lantry Sons was understood by Hagar merely to mean that the property of the partnership "invoices several hundred thousand dollars" nor does it appear that Attorney Hagan ever informed Hagar of the death of Henry E. Lantry and the resulting situation or that Hagar had actual knowledge thereof until some time in 1913.

This brings us to the filing of this suit in April, 1914. At that time Horace Hagan was twenty-two years of age; the other wards had not attained majority. Mary J. Lantry and Helen Lantry Daly were residents of Kansas City, Missouri, and this suit was therefore filed in the Circuit Court of Jackson County. Without undertaking a resume of the lengthy and very complete final petition of bill upon which the case was tried it will suffice to state the theory upon which plaintiffs rely. Plaintiffs' position is that the note being a partnership obligation the debt became a proper charge against the partnership property and assets and also the personal obligation of the partners; that upon the death of Henry E. Lantry and the death shortly thereafter of Fred J. Lantry the defendants took the entire estate of Henry E. Lantry, deceased, including all the former property and assets of the partnership: that all of said partnership property and assets were sold and converted into money, defendants ultimately receiving the entire purchase price of $275,000 in money; that a balance of $10,000 of the principal sum of said note remains unpaid; and that defendants should be declared to have received and to hold said money subject to the payment of this indebtedness and impressed with a trust in favor of plaintiffs in the amount thereof and be required to account to plaintiffs therefor. The answer pleads the Statute of Limitations of Oklahoma; also that the claim is barred by the administration of the estate of Henry E. Lantry had in Chase County, Kansas; and laches of the guardian, Hagar, and appellants, such as bars recovery. However defendants wholly abandoned the Statute of Limitations as a defense.

Defendants' brief tacitly concedes that "under proper circumstances" property of a deceased debtor in the hands of heirs, legatees or devisees can be reached by a bill in equity and applied to the payment of the indebtedness. When special circumstances exist which give rise to, and invoke, some recognized principle or ground of equity a court of equity will take cognizance of a suit by a creditor to charge heirs, devisees and legatees to the extent of the property or assets of the deceased debtor taken by descent or devise; this on

the ground that under such circumstances the distributees take and hold the ancestral property charged with an implied trust. [Borer v. Chapman, 119 U. S. 587; Board of Public Works v. Columbia College, 17 Wall. 521; Chewett v. Moran, 17 Fed. 820; Johnson v. Culbertson, 79 Fed. 5; Continental Natl. Bank v. Heilman, 81 Fed. 36; Bartleson v. Feidler, 149 Fed. 299; Rohrbaugh v. Hamblin, 57 Kan. 393; Walker v. Deaver, 79 Mo. 664; State ex rel. Brouse v. Burnes, 129 Mo. App. 474.]

As we have heretofore stated it is satisfactorily shown that the note which is the basis of this suit was a binding obligation of the partnership composed of Charles J. Lantry and Henry E. Lantry doing business under the firm name of B. Lantry Sons; that all the partnership property and assets were conveyed to Henry E. Lantry individually; that thereafter the business continued and was carried on as formerly and apparently in the firm name; that no notice of dissolution of the partnership was given; that approximately five months later Henry E. Lantry died at Chase County, Kansas, and his estate was administered upon in the probate court of that county; that the guardian, Hagar, in Oklahoma had no knowledge of the course of events and did not learn thereof until long afterwards; that all the former partnership property was sold to Charles J. Lantry the defendants herein receiving the purchase money in the sum of $275,000; and that defendants became residents of Kansas City, Missouri. Plaintiffs and their guardian were at all times residents of Oklahoma. With this situation the interposition of a court of equity of this State is invoked to reach the proceeds which defendants received from the sale of the former partnership property, have same impressed with a trust in their favor and applied to the payment of the balance due on the note.

Respondents as defendants directly advance but two defenses: (1) that the action of Hagar, the guardian, in receiving, accepting and applying to the payment of interest due on the note payments by Freeman, trustee, to whom Charles J. Lantry conveyed the former partnership property, in trust, subsequent to his purchase thereof from the devisees under Henry E. Lantry's will, is a legal bar to the claim made herein based on this note; and (2) that both the guardian and the former wards "were guilty of such laches and such negligent action as prevents a recovery."

While the failure to make a claim against the estate of Henry E. Lantry, deceased, within the time specified by the statutes of Kansas relating to the administration of the estate of deceased persons is stressed by defendants in connection with the defense of laches to which we later refer they seem to also indirectly contend that the administration of the estate of Henry E. Lantry, deceased, in Chase County, Kansas, constitutes a legal bar to a recovery. And that we

will first consider. The basis for such a contention must necessarily be that the administration statutes, or the "nonclaim statute," of Kansas has extraterritorial force or effect. Respondents cite no authority ruling that precise question. Appellants, however, cite a decision of the Supreme Court of Kansas, Toner v. Conqueror Trust Co. (Kan.), 293 Pac. 745, which appears to be substantially the converse of the situation in the present case. That case, in our opinion, rules the point. Samuel C. Gorrell and wife conveyed a large tract of land in Kiowa County, Kansas, by general warranty deed to plaintiff Toner for a consideration of $13,500; of that amount $9500 was paid at the time and Toner executed a "purchase-money mortgage" for the remainder of $4000. Afterwards Gorrell and wife became residents of Missouri. Thereafter it developed that Gorrell had title to only an undivided three-fourths interest in the land, the other undivided one-fourth interest being vested in certain heirs. Gorrell died a resident of Missouri. The Conqueror Trust Company was appointed, by a Missouri probate court, as administrator of his estate. The "purchase-money mortgage" being in default the trust company as administrator instituted a suit in the District Court of Kiowa County, Kansas, to foreclose it. Toner's demurrer to the petition was overruled and as he filed no answer judgment as to him went by default. However the heirs who had title to the undivided one-fourth interest in the land intervened in the foreclosure suit and established their interest. Under the judgment Toner's interest in the land was advertised for sale. Thereafter and before the sale Toner filed this suit to have the default judgment set aside on certain grounds alleged in the petition and charging a breach of warranty by Gorrell sought to recover the sum of $3375 against the administrator, being one-fourth of the purchase price, because of failure of title to that extent, and to have that sum set off against whatever indebtedness he owed the estate on the "purchase-money mortgage." As one defense defendant trust company's answer alleged that it had been appointed administrator of Gorrell's estate by the probate court in Missouri, had qualified and given notice of appointment as such and specifically pleads the "nonclaim statute" of Missouri. The judgment in the trial court went against plaintiff Toner and he appealed. Touching this point the opinion of the Supreme Court of Kansas says: "We have heretofore noted that the defendant pleaded the provisions of the statutes of nonclaim of Missouri . . . and it is the contention of the appellee that the appellant should have presented his claim to the probate court of Missouri within one year from the time of the appointment of the administrator, and that, having failed to do so he is barred from now maintaining his claim." Appellants' first point is set out as follows: "The nonclaim statute of Missouri has no extraterritorial force or effect and cannot operate

to bar the claim.'' A distinction is then made between ''matters which relate to substance, sometimes called matters of right and those which relate to procedure, or matters of remedy'' and it is held that the ''statute sets forth'' and ''relates to the method of procedure with reference to presentation of claims and administration of estates in Missouri.'' The court then says: ''There is no obligation on this court to give the Missouri statute of nonclaim extraterritorial effect. Neither are we able to find any clear decision which impels us to now hold that it should be given extraterritorial effect.'' In support of its holding the Kansas Supreme Court cites Hartman v. Fishbeck (C. C.), 18 Fed. 291, and Wilson v. Hartford Fire Ins. Co. (C. C. A.), 164 Fed. 817, 19 L. R. A. (N. S.) 553. In Wilson v. Hartford Fire Ins. Co., Charles P. Dewey, a resident of Illinois, died, testate, ''owing the Hartford Fire Insurance Company, a corporation of the State of Connecticut, $21,500. . . . His will was proved in the Probate Court of Cook County (Illinois) . . . and such proceedings were had that the time within which, under the administration statutes of Illinois, such a claim could be presented for allowance against the estate, expired without any presentation of the claim. The laws of Illinois provided that in such a case claims not presented should be forever barred.'' Meanwhile Clyde Wilson was appointed administrator with the will annexed of the estate of Dewey in the State of Kansas by a probate court of that state. ''After the time to present its claim for allowance in Illinois had expired, and before the time for its presentation in Kansas, in accordance with the terms of the administration statutes of that state, had run, the insurance company brought an action'' in the Federal Court ''against the Kansas administrator to recover the amount of its claim out of the property of the deceased in that state.'' The administrator contended that the claim was barred by the provisions of the Illinois statutes of nonclaim. The Circuit Court of Appeals (Eighth Circuit, opinion by SANBORN, J.) held that ''property of the estate which is situated in Kansas is not controlled nor is its administration or distribution governed by the laws of the domicile of the testator. The laws of Illinois have no extraterritorial force.'' In Borer v. Chapman, 119 U. S. 587, 30 L. Ed. 532, one Gordon, a resident of the State of Minnesota died testate. The ''bulk of his property was situated'' in the State of California. He ''named two executors in his will, one a resident of Minnesota, the other a resident of California. The will was proved in each state. The Minnesota executor accepted the trust in that state, but notice to creditors was not published and claims against the estate in Minnesota were not barred in accordance with its administration statutes. The California executor qualified in his state, notice to creditors was there published, all claims not presented were barred under the provisions of the statutes of California,

the estate in that state was fully administered, and the executor was discharged." An action at law was brought in the State of Minnesota by a creditor who was a resident of New Jersey against the Minnesota executor "upon a claim which had not been presented in California and which was barred under the administration statutes of that state, and the defendant pleaded that the cause of action was barred in Minnesota by virtue of the administration in California," but the Supreme Court, of the United States, sustained a judgment for the claimant, and said: "If he had chosen, he could have proven his claim there (in California) and obtained judgment; but he had the right to await the result of the settlement of that administration, and look to such assets of Gordon as he could subsequently find in Minnesota, whether originally found there or brought there from California by the executors or legatees of Gordon's estate." Our conclusion is that notwithstanding the statutes of Kansas giving the probate court jurisdiction over the estate of deceased persons in that state limit the time within which claims against such estates must be filed or actions brought to recover thereon, and provide that if such claims are not presented within that time they shall be barred, that such statutes provide a remedy which is exclusive only in that state and do not have extraterritorial force or effect so as to operate as a legal bar to the claim of nonresident creditors, in this instance residents of Oklahoma, seeking through the aid of a court of equity of this State to reach the assets of the estate received by distributees.

Appellants' proposition, that, because Hagar, guardian, received and accepted certain sums from Freeman, trustee, and applied same to the payment of interest due on the note the claim now made is barred, is merely stated but not developed. No authority is cited nor are we advised as to the grounds thereof. It suffices to repeat the observation made in the statement of the case, supra, that the instrument creating the trust, even if it be considered as including this note in the debts mentioned therein, contains no stipulation, provision or restriction as to the payment in full and discharge of the debts therein listed by the acceptance of any partial payments made by the trustee.

As to the contention that there can be no recovery herein on account of laches we have noted that apparently when this suit was filed in April, 1914, in the name of Hagar, guardian, Eulilia, Virginia and Eugene Hagan were yet minors and Horace Hagan had but comparatively recently theretofore attained his majority. At least as to the substituted plaintiffs (and no question is made by respondents as to the substitution) Eugene Hagan was a minor and Horace Hagan had but recently prior thereto attained majority. Certainly laches cannot be imputed or charged to these present plaintiffs. It is said at 21 Corpus Juris, page 241, that "the modern rule

is that no laches can, be imputed to an infant during his minority.'' In Kroenung v. Goehri, 112 Mo. 641, 20 S. W. 661, this court said: ''The general rule is that laches is not imputable to an infant. . . . No laches of infants will prejudice their rights, because the presumption is that they do not understand their rights, and that they are not capable of taking notice of the rules of law so as to apply them to their advantage,'' that is, that ''as a person not *sui juris* cannot act on his own behalf, no laches can be imputed to an infant during the continuance of his minority.'' But appellants' principal contention, and that to which the major part of their argument herein is directed, is that the guardian, Hagar, was negligent in presenting the note for collection and in not enforcing the collection thereof and was thereby guilty of such laches as to now estop these plaintiffs and defeat a recovery by them. Though the purpose of the loan, which was made with the approval of the probate court, was to derive an income on the money of the minor wards and the interest was at the time paid nevertheless defendants complain that as the 'note became due in June, 1904, and the bank stock which the guardian held as collateral security at that time had a value of $125 to $150 per share Hagar should have foreseen that the Topeka bank would fail in July, 1905, and the stock become worthless and that he should have enforced collection in 1904. Though Hagar's dealings after the loan was made, in reference thereto, were with Charles J. Lantry who kept the interest paid on the note to 1910 and in 1906 paid $10,000 on the principal it is claimed that Hagar was guilty of gross negligence in not discovering that Charles J. Lantry had in November, 1903, conveyed his interest in the partnership property to Henry E. Lantry, notwithstanding no notice of dissolution was given and apparently no change made in the manner of conducting the business, and in not discovering that some five months thereafter Henry E. Lantry died and in failing to file a claim in the courts of Kansas against the estate within the time prescribed by the statute of that state. By deposition Hagar testified that he did not learn of the conveyance of the partnership property to Henry E. Lantry and his death until some time in 1913, which is not controverted, whereupon this suit resulted, being filed in April, 1914. A Statute of Limitations is not here involved and mere delay on the part of a plaintiff in asserting an equitable claim does not alone or necessarily constitute laches. It must be a delay that works to the disadvantage and prejudice of defendant. [Davies v. Keiser, 297 Mo. 1, 246 S. W. 897.] In Leslie v. Carter, 240 Mo. 552, l. c. 572, 144 S. W. 797, we said: ''Laches is an equitable defense, it is allowed sometimes when the period of limitation prescribed by the statute has not elapsed; but it is never allowed unless the delay has produced such a change in conditions that the defendant is put at a disadvantage,

and not always then.'' The rule is well stated at 21 Corpus Juris, page 221 as follows: ''Mere delay in asserting a right does not *ipso facto* bar its enforcement in equity, by the great weight of authority, unless the case is barred by the Statute of Limitations. To constitute a defense, the delay must have been such as practically to preclude the court from arriving at a safe conclusion as to the truth of the matters in controversy, and thus make the doing of equity either doubtful or impossible, as through loss or obscuration of evidence of the transaction in issue, or there must have occurred in the meantime a change of conditions that would render it inequitable to enforce the right asserted, or, as commonly phrased, the delay, must have worked injury, prejudice or disadvantage to defendant.'' Defendants do not point out, nor was any evidence offered tending to show, how or in what manner defendants have been prejudiced or put to disadvantage by reason of the guardian's delay in filing this suit. From one viewpoint the failure of the guardian to discover the death of Henry E. Lantry in 1904 and to voluntarily appear in the Kansas court and file claim on the $20,000 note and the accrued and unpaid interest thereon has worked to the advantage of these defendants. Had that been done the estate would then have been chargeable with the full amount whereas in 1906 Charles J. Lantry paid all interest to that date and $10,000 on the principal. If it be granted that laches of the guardian, if shown, can be imputed to the wards and is available as a defense herein against the claim of the present plaintiffs nevertheless, without further review of the facts and circumstances which defendants say show such negligence on the part of the guardian and delay in enforcing collection as to amount to laches, we are of the opinion that the evidence does not sustain that defense. But under the circumstances existing in this case such defense is not available for minors cannot be precluded from asserting their rights, upon attaining majority, ''by reason of any negligence of their guardian.'' [Telegraph Co. v. Davenport, 97 U. S. 369.] ''The authority of a guardian does not extend to the doing of any act detrimental to the ward. He cannot waive, abandon, or release without consideration any right or interest of the ward. . . . A guardian cannot bind the ward by an admission contrary to the latter's interest'' or ''create an estoppel against the ward by his own acts or omissions.'' [28 C. J., pp. 1125, 1126. See, also, Porterfield v. Farmers' Exchange Bank of Gallatin, 327 Mo. 640, 37 S. W. (2d) 936.]

It follows that under the special circumstances shown the plaintiffs were entitled to a decree herein as prayed and that the judgment of the trial court for defendants should be reversed. But upon the record before us we cannot direct or formulate the decree. We hold that defendants received the proceeds of the sale of the

former partnership in trust subject to and charged with the payment there out of this indebtedness. It does not appear from the evidence whether defendants or either of them had knowledge of the existence of the note prior to the filing of this suit. So far as appears the filing of the suit was the first demand made upon them. Plaintiffs' summation of evidence concerning payments credited upon interest shows that Charles J. Lantry paid the interest to, and including that for, the year 1910 and that Freeman, trustee, made payments in 1911 and 1914 which were applied to the payment of interest whereby all interest was paid to August 1, 1914. The suit was filed in April, 1914. The balance remaining unpaid on the principal at that time was $10,000. Plaintiffs claim interest thereon from August 1, 1914, at the rate of seven per cent, the rate of interest fixed by the note. The suit seeks to impress the money received by the defendants from the sale of the partnership property with a trust in the amount then due upon the note. We do not undertake to determine the liability of defendants for interest or if so liable the rate thereof. The question is not briefed and we refer it to the trial court to determine in the ascertainment of the amount due from defendants. Further while both parties concede that the defendants were the ultimate recipients of the money paid by Charles J. Lantry in the purchase of the former partnership property the share or interest of each therein does not appear. In this connection see Walker v. Deaver, 79 Mo. 664. We therefore remand the cause to the trial court with directions to afford the parties opportunity to make such showing and presentation as may enable the court to ascertain the amount for which a trust should be declared and to enter a proper decree for plaintiffs. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.