C. A. RUCKELS ET AL., Appellants, v. JOHN J. PRYOR ET AL.—No. 38159.
—174 S. W. (2d) 185.

Division One, July 6, 1943.

Rehearing Denied, July 20, 1943.

Motion to Transfer to Banc Overruled, October 4, 1943.

820

*I. N. Watson* and *Johnson & Garnett* for appellants.

*Calvin & Kimbrell* for respondents.

822

824

826

BRADLEY, C.—This is an action by property owners affected to cancel the contract for the construction of the second section of the Brookside sewer in Kansas City, and to cancel the tax bills, $132,015.60, issued to the contractor for the construction of said sewer. The trial chancellor refused to cancel, dismissed the petition, and plaintiffs appealed.

The cause was commenced August 14, 1939, by plaintiff Ruckels, a resident of Illinois, but the owner of two parcels of property in the sewer district. Ruckels commenced the cause for himself and all others similarly affected. Thereafter, 208 other property owners in the sewer district were, on their petition, made parties plaintiff. John J. Pryor (same person as J. J. Pryor), Boyle-Pryor Construction Company, a corporation, J. J. Pryor Construction Company, a corporation, Kansas City, the Mayor, Director of Public Works, and other city officers are defendants.

Defendant J. J. Pryor Construction Company was awarded the sewer contract on March 14, 1939, and completed construction July 14, 1939. The work was approved and accepted July 19, 1939. September 25, 1939, the tax bills were issued to the contractor, and were delivered September 28, 1939.

Matthew S. Murray, in April, 1926, was appointed Director of Public Works, Kansas City, by H. F. McElroy, City Manager, and remainded such officer until June, 1939. In June, 1935, Murray was appointed WPA Administrator in Missouri, and remained such until June, 1939. June 17, 1935, about the time Murray was appointed WPA Administrator in Missouri, the City Council of Kansas City enacted ordinance No. 3856 purporting to establish the office of Assistant Director of Public Works. The ordinance provided that the Assistant Director "shall assist the Director and perform such duties of the Director of Public Works as the Director shall prescribe and designate." And the ordinance further provides:

"If for any reason the Director of Public Works is temporarily absent or unable to attend to the performance or cannot personally perform all of his official duties, the Assistant Director of Public Works shall have the power and is hereby authorized to, under his own name, perform all of the duties of the Director of Public Works during his absence or inability to perform such duties as aforesaid."

After Murray became WPA Administrator in Missouri, he spent only about two and one-half days per week in Kansas City, and one of these days was Sunday. The remainder of the week was, for the most part, spent in Jefferson City. N. W. Hyland was appointed, by Manager McElroy, Assistant Director of Public Works June 17, 1935, on the same day ordinance No. 3856 was passed, and functioned as such in all matters pertaining to the sewer, the contract, the tax bills, etc., where, by Charter provisions, the Director was to function.

It is alleged that the contract and the tax bills are void because of an alleged illegal and fraudulent combination and conspiracy between the city officials of Kansas City on the one hand, and the defendant contractors and others on the other hand, which said combination and conspiracy, it is alleged, was designed and intended to monopolize and control the letting of all [187] contracts for public works and public improvements in Kansas City, and it is alleged that the contract and tax bills are void because all proceedings in regard to the establishment and construction of the sewer in question were had before and conducted by N. W. Hyland, assuming to act and acting in his own name as Assistant Director of Public Works, when the City Charter requires that all such acts be performed by the Director of Public Works.

The answer of Kansas City and its officers was a general denial, except it was admitted that the officers named were such officers as alleged. John J. Pryor, and the corporate defendants, in their answer, denied generally, and specifically denied the charges of fraud and conspiracy, and denied that Hyland was without authority to act in connection with the sewer. And these defendants pleaded said ordinance No. 3856, purporting to create the office of Assistant Director of Public Works and the appointment of Hyland as such Assistant

Director, and alleged that Hyland's acts in connection with the sewer, the contract, and the tax bills were lawful; that the contract for the construction of the sewer was approved, confirmed, and ratified by ordinance No. 5245, passed March 18, 1939; that plaintiffs are estopped to complain because they failed to make objection to the execution of the contract, its performance, issuance and delivery of the tax bills until after the sewer was constructed and accepted, and the tax bills issued and delivered to the contractor. In effect, defendants say that plaintiffs should not be heard to complain because of their laches and lack of equity.

The reply alleged that ordinance No. 3856, purporting to create the office of Assistant Director of Public Works was void because contrary to the City Charter, which, it is alleged, "neither contemplates nor provides for an Assistant Director of Public Works, nor authorizes and empowers the City Council to create the office of Assistant Director of Public Works." Also, it is alleged in the reply that ordinance No. 5245, purporting to approve, confirm and ratify the sewer construction contract was enacted "with the fraudulent intent and for the wrongful purpose of furthering and effectuating all of the wrongful, fraudulent and illegal acts referred to and alleged in plaintiff's second amended bill in equity and leading to and culminating in the confirmation of the contract aforesaid and the issuance of tax bills thereunder to the said J. J. Pryor Construction Company, by reason whereof said ordinance was and is wholly illegal, void and of no force and effect."

At the threshold of the merits we are confronted with the contention of the defendants that the appeal should be dismissed, and that plaintiffs should not be heard to complain.

Should the appeal be dismissed? It is argued that plaintiffs are not parties in interest within the purview of Sec. 849, R. S. 1939, Mo. R. S. A., Sec. 849, and are not parties aggrieved within the purview of Sec. 1184, R. S. 1939, Mo. R. S. A., Sec. 1184.

As stated, plaintiff Ruckels had two parcels of property in the sewer district, and the tax bills against these parcels were Nos. 647 and 648, and for $26.48 and $53.04 respectively. Ruckels did not appear at the trial which began June 23, 1941, and finally ended September 20, 1941. It developed at the trial that at some time prior to July 20, 1940, some one, not identified, paid the tax bills against the Ruckels property. The money "was paid into the city treasurer" and by the treasurer "paid to the holder of the tax bills." Defendants argue that upon the payment of the tax bills against the Ruckels property the lien and alleged cloud upon his property were removed and that Ruckels' case collapsed and could not thereafter be maintained by him, since the tax bills against his property were paid. Plaintiffs, other than Ruckels, were made parties after the Ruckels tax bills were paid, and these plaintiffs adopted the Ruckels petition. In the situa-

tion, defendants say that Ruckels had no live complaint after the tax bills against his property were paid, and that, therefore, the added plaintiffs adopted a lifeless petition.

In the petition to be made parties plaintiff, it was alleged that the petitioners were property owners in the sewer district, and their names were set out together with the tax bill number and amount thereof issued against each owner's property. In the prayer of this petition it was asked that the tax bills be cancelled. Assuming, without deciding, that Ruckels' cause was extinguished upon the payment of the tax bills against his property, such would not prevent those moving to be made parties plaintiff from adopting the facts alleged by Ruckels. We do not think that there is any merit to the [188] point on dismissal on the theory that Ruckels' cause had collapsed or was extinguished.

Defendants, however, say that the appeal should be dismissed because the Ruckels tax bills were paid, and because there is no evidence that the tax bills of the 208 added plaintiffs were not paid. The evidence showed that $59,377.81 of the total tax bill issue had been paid, leaving a balance of $72,637.79 unpaid. It also appears that the total amount of the tax bills against the property of the added plaintiffs was $36,414.84, and defendants say that there is no evidence that the tax bills against the property of the added plaintiffs were not among those paid, and going to make the total of $59,377.81 paid. While there was no evidence that the tax bills against the property of the added plaintiffs were not paid, neither was there any evidence that these tax bills were paid. At the close of the case, defendants asked for and were granted leave to amend the answer, and did amend, but did not allege that the tax bills against the property of the added plaintiffs were paid. In the prayer of the answer defendants asked the court to "adjudicate and decree that all the special tax bills, including special tax bills No. 647 and special tax bill No. 648 (the Ruckels bills) . . . are, in all respects, legal, valid and binding, and constitute a valid and subsisting special lien upon the reals estate" in the sewer district. There is no merit in the point on dismissing the appeal, and dismissal is denied.

Are plaintiffs precluded from complaining because of laches or lack of equity? As appears, plaintiff Ruckels commenced this cause for himself and others similarly affected on August 14, 1939, but in the petition then filed J. J. Pryor Construction Company, the contractor and holder of the tax bills, was not made a party. On October 28, 1939, Ruckels filed a first amended petition in which said company was, for the first time, made a party defendant. And on March 27, 1941, Ruckels filed a second amended petition upon which the cause was tried. As appears, construction of the sewer was completed July 14, 1939, a month before the present cause was filed, and three and a half months before the contractor and holder of the tax bills was

made a party. Also, it appears that the city did not issue the tax bills upon acceptance (July 19, 1939) of the sewer work. On August 19, 1939, J. J. Pryor Construction Company, the contractor, filed in the circuit court a petition in mandamus against Kansas City and its officers to compel the issue of the tax bills to said company. Return to the alternative writ in mandamus was filed August 28, 1939. September 19, 1939, judgment in the mandamus suit was entered directing the issue of the tax bills to J. J. Pryor Construction Company, and, as stated, the tax bills were issued September 25, 1939, and were delivered September 28, 1939. It does not appear that plaintiffs or any of them resisted the mandamus suit.

It also appears that A. T. Brink was chairman of a property owners committee in the sewer district. On June 19, 1939, Brink addressed a communication to the property owners in the district, telling them that the tax bills would be computed at "three-quarters cents per square foot"; that "for an average lot of 50 x 130 feet, the tax will be $48.75, and proportionately greater for a larger lot." Brink suggested that each property owner contribute to the litigation fund "ten per cent of the expected tax" against his property. And in this communication he said this: "Since the sewer is nearly completed, the result would be, if successful, that the sewer would be constructed and that the property owners would not have to pay for it. In other words, you could have your cake and eat it."

Countering the defense of laches and lack of equity, plaintiffs' evidence showed the following:

March 22, 1937, Hyland, as Assistant Director of Public Works, adopted and entered of record Declaration of Necessity No. 1665, and on March 23, 1937, he adopted and entered of record Declaration No. 1666. Declaration No. 1665 pertained to the first section of the Brookside sewer, which section was constructed in 1937, by defendant Boyle-Pryor Construction Company. Declaration No. 1666 pertained to the second section of the Brookside sewer. "A great many, . . . probably 75 or 100" protesting taxpayers were at the office of the Director of Public Works on April 2, 1937, the day set for a hearing on the two proposed projects, and considerable protest was made. After the meeting on April 2, 1937, the second section of the Brookside sewer project lay dormant for awhile; "proceedings therefor were dropped", plaintiffs say.

However, the second section project was not dropped for keeps. February 13, 1939, Hyland, as Assistant Director of Public Works, rescinded declaration No. 1666, made March 23, 1937, and adopted declaration of necessity No. 1705, which again started things moving for the construction of the second section of Brookside sewer. Protests were again made, but this time the protests were unavailing and the project went through to construction and issue of the tax bills. We might as well note here as elsewhere, that each of the

declarations of necessity, Nos. 1665 and 1666, showed on its face to have been been made by the Assistant Director of Public Works, but declaration No. 1705 opens as follows: ''The Director of Public Works of Kansas City, Missouri, hereby declares that it is necessary to make the following public improvements'', etc., as if ·Murray was to sign. The declaration, however, was signed by Hyland, and not Murray.

May 26, 1939, Ruckels filed suit (based on same theory as here) in the federal district court in Kansas City against John J. Pryor, Boyle-Pryor Construction Company, Matthew S. Murray, the City, the Mayor, and the City Council, to enjoin the issue of the tax bills, but the J. J. Pryor Construction Company was not made a party. The federal court case was dismissed August 9, 1939, for want of jurisdiction, and the present cause filed in 5 days thereafter.

''The doctrine of. laches will prevent relief to one who has stood idly by with knowledge of his rights and allowed the situation to so change that it would be an injustice.to others to grant the relief that was tardily sought.'' Klebba v. Streumpf, 224 Mo. App. 193, 23 S. W. (2d) 205, l. c. 207.

''The doctrine of laches is an equitable concept and finds its particular field of application in equity cases. But, whenever applied, the rule of action is founded on some change in the status of property or in the relation of the parties to each other which has operated to the disadvantage of one of the parties. As stated in Rollestone v. National Bank of Commerce, 299 Mo. 57, 252 S. W. 394, 400: 'Laches, in legal significance, is not mere delay, but delay that works to the disadvantage of another. It is not, like limitation, a mere matter of time, but is principally a question of the inequity of permitting a claim to be enforced, this inequity being founded on some change in the conditions· or relations of the property or the parties.' '' State ex rel. Edwards v. Donovan et al., 226 Mo. App. 392, 41 S. W. (2d) 842, l. c. 846.

''The generally accepted doctrine is that laches is not a mere delay, but delay that works a disadvantage to another.'' Collins v. Lindsay et al. (Mo. Sup.), 25 S. W. (2d) 84, l. c. 89, and cases there cited. See also, Hagan et al. v. Lantry et al., 338 Mo. 161, 89 S. W. (2d) 522, l. c. 529; Pryor v. Kopp, 342 Mo. 887, 119 S. W. (2d) 228, l. c. 233.

While the J J. Pryor Construction Company was not a party to the suit in the federal court, and was not made a party to the present cause until October 28, 1939, J. J. Pryor himself was a party defendant in both suits from the beginning. And, as appears, infra, J. J. Pryor owned 50% and his wife 25% of the stock of the J. J. Pryor Construction Company. In the situation, we could not assume that the J. J. Pryor Construction Company was ignorant of all the activities of plaintiffs to do something about the tax bills. And there is no

suggestion that what defendants call the *delay* worked any disadvantage to the J. J. Pryor Construction Company. We find no merit on the point based on laches and lack of equity.

The fact that some of the property owners may have been willing to have a little free cake, as suggested by Brink's letter, is not sufficient to amount to unclean hands.

We now take up the merits. In effect, plaintiffs (appellants) make two contentions, as would appear from what is said, supra, of the pleadings, and these contentions are: (1) That the evidence establishes that the sewer construction contract and tax bills were the result of the alleged conspiracy between the city officers and certain alleged favored contractors, including the J. J. Pryor Construction Company; and (2) that the tax bills are void for lack of authority to issue. Defendants deny, as appears, supra, the alleged conspiracy, and they say that the acts of Hyland, Assistant Director of Public Works, should, in any event, be considered the acts of a de facto officer, and valid, regardless of Charter authority in the City Council to create the office of Assistant Director of Public Works.

The record shows that from May 1, 1932, down to the date of the sewer contract, March 14, 1939, practically all public improvements in Kansas City were made by the following seven companies:

1. The Midwest Paving Company, capital $10,000, 1000 shares, $100 each, incorporated March 28, 1927, by William S. Broderick, 498 shares, W. A. Ross, 498 shares, and Edward L. Schneider, 4 shares; all paid up.

2. The Ready Mixed Concrete Company, capital $80,000, 800 shares, $100 each, incorporated December 28, 1927, by T. J. Pendergast, 400 shares, William A. Ross, 399 shares, and Edward L. Schneider, 1 share; all paid up.

3. The Midwest Pre-Cote Company, capital $25,000, 250 shares, $100 each, incorporated May 20, 1931, by Edward L. Schneider, 92½ shares, Michael Ross, 67½ shares, Frank L. Carswell, 25 shares, and William 'S. Broderick, 65 shares; all paid up.

4. The Boyle-Pryor Construction Company, capital $2,000, 100 shares, $20 each, incorporated March 1, 1932, by W. D. Boyle, 49 shares, John J. Pryor, 50 shares, and Roy W. Crimm, 1 share.

5. The Dixie Machinery & Equipment Company, 50 shares, no par value, incorporated August 1, 1932, by John J. Pryor, 25 shares, William D. Boyle, 24 shares, and Roy W. Crimm, 1 share. The company commenced business with $1,000.

6. The Missouri Asphalt Products Company, capital $2,000, 100 shares, $20 each, incorporated July 12, 1934, by J. J. Pryor, 50 shares, W. D. Boyle, 49 shares, and Roy W. Crimm, 1 share; all paid up.

7. The J. J. Pryor Construction Company, capital $3,000, 100 shares, $30 each, incorporated September 19, 1938, by J. J. Pryor, 50 shares; Catherine R. Pryor, wife of J. J. Pryor, 25 shares, and J. H. Frew, 25 shares; all paid up.

The record shows that W. D. Boyle, of the Boyle-Pryor Construction Company, was struck by lightning and killed on June 3, 1938, and that the J. J. Pryor Construction Company was organized September 19, 1938, in about three and a half months after Boyle's death, and less than 5 months before declaration of necessity No. 1705.

Sec. 92, Art. 4, City Charter, provides that all contracts for public improvements shall be in writing and executed in the name of the City by the head of the department or officer concerned, except in certain named cases, and shall be awarded to the lowest and best bidder. And in all cases involving more than $2500, advertising and competitive bidding are mandatory. The record shows, however, that notwithstanding the Charter, in the period from May 1, 1932, to May 1, 1939, a great amount of public improvement work in Kansas City was done, involving a cost in excess of $2500, and such work was awarded from time to time by Murray or Hyland without written contracts and without competitive bidding. The companies so favored and the amount of the work follow:

Boyle-Pryor Construction Company ..........$  663,204.75
Dixie Machinery & Equipment Company ..... 1,416,248.18
Missouri Asphalt Products Company .........    8,460.38
Ready Mixed Concrete Company ............  642,564.58
Midwest Paving Company .................  127,165.25

$2,857,643.14

In addition to the above amount of money paid to the named companies without competitive bidding, there was $874,144.65 paid to them in the same manner, and over the same period, from the Park Department and the Water Works Department. The total is $3,731,787.79.

The modus operandi is stated in plaintiffs' brief as follows: "The City Council, from time to time, would pass an appropriation ordinance, appropriating a lump sum of money out of a particular bond fund (improvement bonds money) to the Director of Public Works (Murray) to be used by him only for the purposes specified in the bond issue. Hyland or Murray (Murray before Hyland's appointment, and one or the other thereafter) would then approve separate purchase orders or invoices, each in the amount of less than $2,500, but all relating to the same work on the same improvements. These purchase orders, when so approved, would, in many cases, be consolidated and paid by one warrant drawn in the aggregate of several purchase orders at one time. Thus, although the improvement in question would be one requiring an expenditure of far more than $2,500, the Charter requirement of advertising and competition would be evaded by splitting the gross amount up into separate purchase orders for $2,500 or less."

The City has a record called bid books upon which bids, when there was bidding, are entered. These books show that from May 1,

1926, to May 1, 1932, a total of 129 sewer contracts were let upon competitive bidding; that the number of bidders on these contracts ranged from 1 to 11, the average was 6.7 per contract. After the incorporation (March 1, 1932) of the Boyle-Pryor Construction Company, and over the period from May 1, 1932, to May 1, 1939, there were only 21 sewer contracts let upon competitive bidding, the bidders ranged from 1 to 6, the average was 3.7 per contract. And over this period the bid books show that the Boyle-Pryor Construction Company submitted 36 bids on various work projects, and was successful in 19, aggregating $686,314.93. Of the 17 that Boyle-Pryor Construction Company did not get, the Midwest Paving Company got 9 and J. J. Pryor individually 2. On 5 of the 9 awarded to Midwest Paving Company, Boyle-Pryor Construction Company was the only other bidder.

The record shows the *luck* of some bidders who submitted bids in competition with the alleged favored bidders. Over the period from May 1, 1932, to May 1, 1939, W. C. Mullins submitted 21 bids, all against Boyle-Pryor Construction Company, all unsuccessful; T. M. Walsh submitted 9 bids, and was successful in one; Tobin-Walsh Construction Company submitted 4, all unsuccessful; Brown Brothers submitted 4 bids, all unsuccessful.

Plaintiffs say that the J. J. Pryor Construction Company "was chosen by agreement to submit the lowest bid" for the construction of the sewer. The record shows that Brown Brothers and the List Construction Company bid on the sewer job (there were only the 3 bids), but plaintiffs, in effect, claim that these bidders were *in* on the conspiracy, and knew that their bids were higher than that of J. J. Pryor Construction Company. And plaintiffs say that all 3 bids "were high, exhorbitant and unreasonable."

Before a consideration of the evidence as to the three bids, we might say a word about the power and functions in connection with public improvements of the Director and Assistant Director of Public Works. The Director of Public Works is well nigh the whole thing, so to speak, in the matter of public improvements in Kansas City. In the matter of such improvements, with few exceptions, the Director of Public Works, under the City Charter, performed about all the acts that would, absent such Charter provisions, be performed by the Mayor and City Council. The Director of Public Works made the "declaration of necessity". The declaration, called also a resolution, was entered on the records of the department in which the improvement was to be made and stated "the nature of the improvements, and, when the same is to be paid for in special tax bills or other evidences of assessments upon real property (or out of the revolving public improvement fund, to be reimbursed by collection of such assessments), it shall state the method of making assessments to pay therefor. The Director shall also have prepared by the city engineer an estimate of the probable cost of such proposed improvement."

After the declaration of necessity, or the *one man resolution,* the Director of Public Works, by an order, fixed "a day upon which a hearing in respect to such improvement" was had, which day was required to be within 30 days from the date of the order. It is the Director's duty to publish notice of the hearing. The Charter provides: "Such notice shall recite briefly the fact that such improvement is proposed, the general nature thereof, and the streets or other points within which, such improvement is proposed to be made, and that a hearing concerning the same will be had by the said Director at his office, or other place designated in the notice, and the date upon which the hearing shall be had."

At the hearing property owners could "by written petition or otherwise, present their views in respect to the proposed improvement to the said Director, and the said Director may adjourn the hearing from time to time. After such hearing, if the said Director shall determine that it is not for the public interest that the proposed improvement, or a part thereof, be made, and paid for either out of the general fund or by any method of assessment, or otherwise, he shall make an order to that effect, and thereupon the proceedings for the improvement, or part thereof, determined against by such order, shall stop and shall not be begun again until the adoption of a new resolution."

After the hearing, "if no such determination against the improvements is made, or if only a part of the proposed improvements be determined against by said Director, he [192] shall perfect and adopt plans and specifications for the proposed improvement not determined against, including, as he may deem proper, provisions for the maintenance thereof for a stated period."

After the plans and specifications are *adopted,* the Director advertises "for bids for the doing of the work, by publication in the newspaper then doing the city printing, or if there be no such paper, then in any newspaper in Kansas City, Missouri, for not less than five days, within a period of twenty days prior to the day set for receiving bids. Any and all bids may be rejected. Except for such right of rejection, the Director of Public Works shall let the contract to the lowest and best bidder therefor, and shall cause the contract so let to be formally executed by the contractor and by said Director on behalf of the city. Such contract, before it shall be binding and effective, shall be confirmed by an ordinance of the said Council, as hereinafter specified, and when so confirmed shall in all respects be considered and held to have been authorized by the city."

There were three bids, as appears, supra, on the sewer project here concerned, as follows: J. J. Pryor Construction Company, $132,207.-50; List Construction Company, $133,000.00; Brown Brothers, $135,-500.00.

J. H. Frew, who had been in the contracting business for 20 years, was a stockholder, secretary, and construction superintendent of the

J. J. Pryor Construction Company. Prior to his connection with this company, he was general superintendent of the Boyle-Pryor Construction Company for "approximately six years." Frew prepared the bid for the J. J. Pryor Construction Company. Frew testified that before filing his bid, he examined the blue prints, plans and specifications of the proposed sewer, to "determine the amount of work to be done, the excavation, and so on"; that he went upon the ground and made "actual inspection", ascertained by going upon the ground that it was "not feasible to construct that sewer the usual way, like you would in an open place; . . . it was a very complicated job . . . . because we were confined to such a small area, both in doing the excavation and also in getting the materials, and lowering the pipe, and there were houses along on the east side of the channel of the creek (in which sewer pipe was placed), and the street car tracks along the west side of the street, and it was not possible to put the machine in there to do this excavation, or to lower this pipe (96 inch concrete pipe) or to get the material down, without procuring some right of way from the street railway company; and it was necessary for us to go to the street railway company and have them permit us to use their east track to run our machines on, to do the excavation, and also to get the concrete material down into the ditch and to lower the pipe, and everything"; that before he prepared his bid he went to the street railway company, ascertained that he might use their right of way (while constructing the sewer) and that the cost for this use was figured in his bid (this cost was $5231.63). "Q. Did you go out and make any special borings or soundings to ascertain the amount of rock you would have to go through? A. I went out and estimated it, I got right down in it on several occasions"; that before he bid he ascertained the price of the 96 inch pipe that had to be used; that he got this pipe from the Lock Joint Pipe Company at $15 per foot; that in arriving at amount of his bid, he figured insurance, "compensation, social security, bond, fees, overhead contingencies, discount on tax bills and rental of equipment." It will not be necessary to state further detail on the manner of the preparation of the bid prepared by Frew. The record shows that before he filed his bid he gave thorough consideration to all the items and contingencies that might figure in the cost of construction.

Frew said that he estimated the cost of constructing the sewer at $119,220.78; that his bid (for his company) was $132,207.50; that the actual cost of construction was $124,362.35; that he "*deposited a certified check for $2500 with Mr. Murray* (italics ours). . . . Q. What process do you go through when you bid? A. You first take it (the bid) to the Director of Finance and have it stamped, and give him the certified check (he gave the check to Murray) and you put your bid in an envelope, and take it up and put it in the bid box in the Director of Public Works office. Q. Where is that

bid box? A. In the Director of Public Works office. Q. Is that a box something like a mail box? A. Yes. It has a little slide and a padlock. Q. Can anybody else get into it? A. No, sir. [193] Q. It is a receptacle in which they deposit those bids? A. Yes, sir. Q. And from that box, the proper party acts, and they open it? A. Yes, at the time of closing the bids. Q. As to the bidding, they require you to have your bid in there before a given day and hour? A. Yes. Q. And your certified check and your bond? A. The certified check is filed with the Director of Finance; he stamps it; you don't file it with the bid. When you submit a bid to the Director of Finance he stamps it, and keeps the check, and gives you a receipt for it."

Frew testified that prior to filing his bid he did not talk with Robert W. Brown, of Brown Brothers, nor with William List of the List Construction Company; that he in fact did not know who bid on the job.

William List testified that he had been in the contracting business for 40 years; that he and his nephew, who had been in the contracting business for 14 years, "went over this particular job" for the List Construction Company; that he made the estimate; consulted "the material and record furnished by the City, the engineer, for instance, the plat or blue print"; that his company made its own pipe "and we figured about what it would cost to make it, without going around and getting prices"; that 96 inch concrete pipe could be obtained other than from the Lock Joint Pipe Company; "you can get it many places"; that he made the bid for his company in good faith, and that his company would have performed had the bid been successful. "Q. You were not making a complimentary bid for someone to get the job? A. I have never made any in my life— that is one record I have got."

List further testified that, except for this bid, he had not bid on a sewer job in Kansas City for 15 years; that he had known J. J. Pryor "before we went into contracting here . . . back to 1910 or 1911"; that he had sold J. J. Pryor "in the neighborhood of $20,000 worth" of equipment; that he "naturally supposed" that he (J. J. Pryor) was going to bid on the sewer job; that he recalled that the Boyle-Pryor Construction Company bid on the first section of the Brookside sewer; that he had "gone out on the job", the present sewer; saw that the "creek or brook that was to be enclosed was an open creek."

Robert W. Brown, partner in Brown Brothers, testified that his firm had been engaged in the general contracting business for about 25 years; that he thought sewer work was his principal work. "Q. And were you building elsewhere than in this locality—I mean the locality around here? A. Yes, sir. Q. And elsewhere than Kansas City, Kansas? A. Yes, sir—Topeka, Kansas City, Kansas, and elsewhere—and Kansas City, Missouri"; that he prepared the data from

which he made his bid; that he knew when he bid that the city estimate was $133,000; that he got the blue prints and specifications from the "city engineer's office"; that he "got prices on materials, and I think on the tax bills"; that he went out on the job, looked over Brookside; "I just gave it a good looking over; I did not bore the job"; that he made "an inspection of Brookside creek"; that it was an open ditch; that had he been the successful bidder he would have performed.

Brown further testified: "Q. Mr. Brown, the records that have been offered in evidence here show that in the period from May 1, 1932, to May 1, 1939, that your firm, Brown Brothers, submitted four bids for work in Kansas City, Missouri—is that right, according to your memory? A. I presume it is, I would not know. Q. You are not prepared to say that is not correct? A. I don't know whether that is the number or not; I know we bid on sewers. Q. And those records further show that each of those bids was submitted against the Boyle-Pryor Construction Company, and the J. J. Pryor Construction Company, is that right? A. I would not know who bid on the job—I presume they did. Q. And the records further show that you were unsuccessful in all four bids, is that correct? A. That is correct.

And further: "Q. Did you have any conversation with Mr. Pryor as to your bid in this matter? A. No. Q. Did you know that Mr. Pryor was bidding? A. I knew the Boyle—Boyle had died before that time—but I knew they were bidding. Q. You knew that? A. Yes, sir. Q. Had you talked about the job with him? A. No. Q. Had you met him at the Round Table down at the Union Station at lunch, [194] and discussed it with him at all? A. Not at all. Q. You did not know he was bidding? A. I said I did know they were bidding. Mr. Frew, across the table, was there. Q. Did he talk to you about it at that time? A. Just as one contractor would to another. Q. Before the bidding? A. After the bids were put in. Q. But not before? A. No. Q. You were there before the bids were opened, weren't you? A. Yes. But the custom is, when you go up you deposit your bid at the Hall, and put the bids in the bid box, and then wait—Q. (interrupting) And then—A. (continuing) I was going to say I wait for them to open the bids. Q. You saw Mr. Frew there beforehand? A. I don't believe I did see him before the bids were deposited in the box. Q. You did not ask him how much his bid was? A. I did after the bids were deposited, yes."

Brown denied knowing that the Pryor and Pendergast Companies had been favored. "Q. Do you want to tell the court that when you submitted this bid you expected to get that work? A. I certainly did. Q. You want the court to understand that? A. I expected to get it on the bid, I bid it high, but I did it in good faith. Q. Did you bid it high to get it above the Pryor bid? A. No, sir, I did not."

There were two outstanding things that Frew did in arriving at the amount of the bid of the J. J. Pryor Construction Company that List and Brown did not do, viz.: Frew made borings to determine what *rock* he would encounter and he ascertained approximately. what it would cost to get permission to occupy the right of way of the street railway while engaged in executing the work. So far as appears here, Frew made a much more thorough estimate as to the probable cost than did Brown and List. Also, it will be noted that the difference in the three bids is not much, considering the size of the project.

John Spitcaufsky, a witness for plaintiffs, testified that he resided in Kansas City, and was engaged in the contracting business, "grading, paving, sewers", over a period of 40 years; that he tried to get "a set of plans for this sewer job", but was not successful; that Tod Woodbury got the plans for him (Charles P. Woodbury was a member of the City Council and a defendant); that the Burns & McDonald Engineering Company made for him an estimate of the cost of the job, which was compared with his own estimate; that he "prepared a bid for the second section of the Brookside sewer"; that he went to see H. S. Allen, manager of the Lock Joint Pipe Company about the price of the 96 inch concrete pipe required, and plaintiffs sought to show what Allen said to Spitcaufsky, but were not permitted to do so. The court ruled that such evidence was hearsay. Plaintiff contended, however, that the evidence was competent because Allen was "one of the conspirators."

Not permitted to show by Spitcaufsky what Allen said, plaintiffs made this offering: "We now offer to prove by this witness that he made inquiry from H. S. Allen, of the Lock Joint Pipe Company, as to the cost of the 96 inch concrete pipe that was to go into the construction of the second section of the Brookside sewer, and that Mr. Allen refused to quote him a price, saying that he was tied up on the job." The offering was not formally refused, but was, in effect, refused.

Allen was a witness and testified that in addition to his company, Lock Joint Pipe Company, the Massey Concrete Pipe Company, Kansas City, manufactured the 96 inch concrete pipe; that his company sold to the J. J. Pryor Construction Company the 96 inch concrete pipe that went into the second section of Brookside sewer "for $15 a foot and collected $15.30, including tax." And incidentally, Allen said that his company sold the 96 inch concrete pipe that went into the first section of Brookside sewer, which was constructed by the Boyle-Pryor Construction Company; that 96 inch pipe was in sections of four feet each and the weight of a section was 11,632 pounds; that there were 2832 feet of this pipe in the sewer. "Q. Now, Mr. Allen, was the price of $15.00 per foot of the ninety-six inch pipe that you delivered to the J. J. Pryor Construction Company a standard price or a special price that was given to him for this particular job? A. It was given to him for that particular job."

It appears that in estimating what it would cost to construct the sewer, the J. J. Pryor Construction Company figured a discount of 10% on the tax bills, and that sum, $13,201.56, went into the total of $124,362.35, the amount that Frew said the sewer construction cost.

We think that Murray's personal relation with J. J. Pryor, and others of the conspirators, is quite important, especially when considered in connection with the fact that the Assistant Director of Public Works was, by the ordinance, purporting to create such office, practically under the direction of Director Murray, and when considered in connection with the amount of money that was practically in Murray's hands for Public Works.

It will be noted that J. J. Pryor owned 50 of the 100 shares of the Boyle-Pryor Construction Company, 25 of the 50 shares of the Dixie Machinery & Equipment Company, 50 of the 100 shares of the Missouri Asphalt Company, and that he and his wife owned 75 of the 100 shares of the J. J. Pryor Construction Company. And because of the positions held by Murray, viz., Director of Public Works of Kansas City, and WPA Administrator in Missouri, he could, if inclined, be *wondrous kind* to contractors who reciprocated.

As WPA Administrator in Missouri, Murray had in his hands, so to speak, the expenditure of $200,000,000 for public works over the period he was such Administrator, from June, 1935, to June, 1939, and this sum was in addition to the amount of money in his hands, as Director of Public Works, for public improvements in Kansas City. Murray testified in the present case that the Department of Public Works in Kansas City expended on general work, the maintenance of streets, sewers, the street cleaning department and other departments, about $2,500,000 per year; that the Department of Public Works has supervision of the expenditures for all work done by tax bills which in some years ran as high as $8,000,000; that when the ten year bond plan was voted this Department had the expenditure of those bonds, that is, that part of the bonds that were not directly under the Park Department. "Q. Well, in other words, Mr. Murray, there was a very large amount of money handled through the office of Director of Public Works each year? A. Yes, sir. Q. You were Director? A. Yes, sir. Q. And, of course, it was your duty, if I understand your testimony correctly, to supervise these projects and the handling of all this money and the spending of it for public improvements and public projects? A. Yes, sir."

The record abundantly shows that Murray, as Director of Public Works, was definitely *inclined* to *favor* what we may term the Pendergast and Pryor Companies, mentioned in this record. Such is, in effect, conceded. During the trial the court remarked: "I think there is no question but what the relationship between the city officers and the contractor (J. J. Pryor Construction Company) is an important

issue in this case." The relation between Murray and some of those connected with the Pendergast and Pryor companies is definitely reflected in the following transactions:

April 22, 1937, a month after the declaration of necessity for the first section of the Brookside sewer, the contract for which was let to the Boyle-Pryor Construction Company, J. J. Pryor purchased, through the Produce Exchange Bank, Kansas City, $25,000 in Government bonds. In July, 1937, $4,000 of these bonds were pledged by Murray with the Commerce Trust Company, Kansas City, to secure a loan. There is no explanation as to how Murray came into the possession of these bonds.

July 13, 1935, about one month after Murray became WPA Administrator in Missouri, Thomas L. Farrington, a St. Louis insurance man and an old friend of Murray, W. D. Boyle, and J. J. Pryor, loaned $2,000 to Murray. About a week later this loan was paid by a cashier's check of the Commerce Trust Company, Kansas City. The cashier's check was purchased by E. L. Schneider of the Midwest Paving Company, the Ready Mixed Concrete Company, and the Midwest Pre-Cote Company. There is no explanation as to why Schneider paid Farrington.

The Boyle-Pryor Construction Company was the successful bidder on a $2,000,000 contract "for the building of some new penitentiary and the altering of some of the old penitentiary buildings at Jefferson City", and the work started about June, 1937. Thomas L. Farrington had a 25% interest in this contract and the Boyle-Pryor Construction Company had the remaining 75% interest. The record does not so show, but it is common knowledge that the penitentiary building job was partly financed by the WPA. The record does show, however, that W. D. Boyle and J. J. Pryor, who together owned 99 of the 100 shares of the Boyle-Pryor Construction Company, *gave* Murray a 25% interest in the *profits* of the [196] penitentiary building job. Farrington testified that "Mr. Murray showed me a paper some time after I entered into my contract with Boyle and Pryor indicating that Boyle and Pryor had given Mr. Murray a twenty-five per cent interest in their part of the contract." And he further testified that in a conversation with Pryor about Murray's interest in the profits of this job, and why Murray was given an interest in the profits, Pryor said that "they (Boyle, Pryor and Murray) were good friends and that they (Boyle and Pryor were under some obligations to him and he (Pryor) wanted to pay him by giving him a share of the profits, if any, on this job." And it appears in Murray v. United States, 117 Fed. (2d) 40, that 25% of these profits was $30,000. When Murray was asked, in the present case, about his *cut* in the profits of the penitentiary job, he said: "I don't see why I should answer that. . . . I claim constitutional rights."

Two other instances appear in the record to the effect that Murray may have been the beneficiary of similar gratuities. One of these was on October 1, 1934, and was for $750 and concerned a check for $750 given by Boyle-Pryor Construction Company, and deposited with a bid on a paving job; the other concerned two cashier's checks totaling $400 and purchased by E. L. Schneider.

Following are some of the instances where Murray or Hyland extended their *favors*. The municipal airport job in Kansas City was a joint undertaking by Kansas City and the WPA, and the total cost was more than a million dollars. The federal WPA Administrator directed that ready mixed concrete be used only when it could be obtained at a reasonable price, and when its use would not dispense with a material number of WPA workers, or when "the operating conditions are such as to preclude mixing the concrete at the site of the work." Murray, as State WPA Administrator, certified to the federal WPA Administrator that it was necessary to use ready mixed concrete because the operating conditions were such "as to preclude mixing the concrete at the site of the work." Counsel for plaintiffs, in the brief, make this observation: "Just why the wide open spaces of an airport would involved operating conditions precluding the mixing of concrete at the work was never explained by Murray or by anybody else", and then counsel say (based on the record):

"There was no competitive bidding or written contract for the ready mixed concrete furnished on the municipal airport job. The Ready Mixed Concrete Company is, as is well known, a Pendergast Company. It sold the concrete to the city without written contract and without having submitted a competitive bid at the price of $8.15 per cubic yard. At that price, 300 cubic yards would cost $2,445. Although the Ready-Mixed Company sold for this one project $289,-666.86 of ready mixed concrete, the sale was split up into 127 separate sales, represented by that number of separate purchase orders, the great majority of which were in the amount of exactly $2,445 each. On practically every day on the work at the airport there was more than 300 cubic yards of concrete delivered on the job, the daily totals running, in some instances, more than 700 cubic yards."

Another project was the Winner Road under the direction of the office of the Director of Public Works. On this job the Boyle-Pryor Construction Company received, in 1938, from the Trafficway Bond Fund the sum of $102,413.82. This amount was paid under the less than $2500 plan, and was handled by Hyland as Assistant Director of Public Works. There were 46 separate purchase orders, many were for $2499. Under the same plan, Boyle-Pryor Construction Company, in 1937, got $17,922.53 on a 6th street job, $48,865.74 on an Independence Avenue job (all approved by Hyland).

These instances here set out, where the less than $2500 plan was used, are just some of those that go to make up the total money, as appears, supra, and received under this ingenious plan by the Boyle-Pryor Construction Company, the Dixie Machinery & Equipment Company, the Missouri Asphalt Company, the Ready Mixed Concrete Company, and the Midwest Paving Company.

The trial court, when judgment was entered, filed a memorandum in which it is stated: ''The evidence as presented, to the end of establishing a conspiracy, in my opinion, unequivocally demonstrated the fact that there was a conspiracy between the Boyle-Pryor Construction Company and the city officials, whereby competitive bidding was prevented, this for the purpose of permitting *defendant contractors* (italics ours) to do construction work which cost far in excess of $2,500, upon a privately agreed [197] price, all of which was in violation of the Charter. That the Boyle-Pryor Construction Company operated under such a conspiracy practically to the date of the contract here in question is clearly established by the evidence.'' Also, in the memorandum, the trial court stated that upon a consideration of all the evidence, plaintiffs had done no more than ''establish a possibility that defendant, J. J. Pryor Construction Company was chosen by agreement to submit the lowest bid for the construction of the second section of Brookside sewer''; that plaintiff's evidence ''on this phase of the case is insufficient to establish the allegations of the petition.''

There were only three *defendant contractors,* viz.: John J. Pryor, Boyle-Pryor Construction Company, and J. J. Pryor Construction Company. Such being so, the inference might be drawn that the trial chancellor, by the use of the words *defendant contractors* in the memorandum, was of the opinion that the evidence ''unequivocally demonstrated'' that the defendant contractors, including the J. J. Pryor Construction Company, after it was organized, were *in* on what may be termed the *less than $2500 racket,* but that the evidence was not sufficient to justify cancellation of the tax bills on the theory that the J. J. Pryor Construction Company ''was chosen by agreement to submit the lowest bid.''

Of the trial court's conclusion, counsel for plaintiffs aptly say: ''That conclusion of the trial court overlooks the object and purpose of the conspiracy which the trial court found did exist. The conspiracy was continuous in operation and single in character, having relation to no particular public improvement, but constituting an understanding and agreement between the contractors and the city officials without limit as to time, to suppress, prevent and eliminate competition and competitive bidding as to *all* public works and improvements and thereby effect a monopoly in all such construction work for the Pryor and Pendergast companies. The object of the conspiracy is well shown by the results it accomplished. The record shows

conclusively that from May 1, 1932, to May 1, 1939, up to the very time of the contract in suit, there was an actual monopoly in all construction work for the Pryor and Pendergast companies. No other companies were successful bidders where contracts were let upon a form of competitive bidding. No other companies were the participants in over $3,000,000 of funds which should have been dispersed only on public competitive bidding.

"To say that this conspiracy continued down to the very time of the contract in suit, but that the evidence does not show that it influenced the making of the contract in suit, is to overlook the well established rule of law that, because the conspiracy is shown to exist and to be continuous and, because the contract in suit is squarely within the object, purpose and intention of the conspiracy, the law will presume that the conspiracy did in fact continue to an include the contract in suit."

It would seem that the trial court found for defendants and refused to cancel the contract and the tax bills solely because the evidence, in the opinion of the court, was not sufficient to justify cancellation of the contract and tax bills on the theory that the J. J. Pryor Construction Company "was chosen by agreement to submit the lowest bid." We do not think that plaintiffs' case depends solely on the charge that the J. J. Pryor Construction Company was chosen by agreement.

The very purpose of the conspiracy, admitted to exist, was to monopolize for the favored companies, ultimately their stockholders, all public construction work. But defendants say that "all the public improvements were made without written bids or contracts and all transactions not connected with the sewer in question occurred many years prior to the incorporation and legal existence of the J. J. Pryor Construction Company." All transactions "not connected with the sewer in question", did not occur *many* years prior to the incorporation (September 19, 1938) of the J. J. Pryor Construction Company. Subsequent to March 22, 1937 (date of declaration for the first section of the Brookside sewer) the Boyle-Pryor Construction Company, an admitted *favorite* of the conspiracy, was the *successful bidder* for the construction of the first section. Also, it appears that after the incorporation of the J. J. Pryor Construction Company, and up to May 1, 1939, it made four bids on public work projects and was successful in two, a sewer contract for $16,916.25, on September 22, 1939, three days after it was incorporated, and the contract here involved. These two contracts were the only sewer contracts for 1938-1939. It does not appear what competition the three days old *infant* encountered in securing the first of these contracts.

It appears also that J. J. Pryor, during the admitted conspiracy period, was president of the Missouri Asphalt Company and the

Dixie Machinery & Equipment Company, and was secretary-treasurer of the Boyle-Pryor Construction Company, all admittedly beneficiaries of the conspiracy. And it appears that J. J. Pryor was president of the J. J. Pryor Construction Company and as such, signed the corporate named to the bond which accompanied the bid, and to the contract here involved.

The record shows also, that the J. J. Pryor Construction Company had "never owned any equipment", and that J. J. Pryor "arranged with the Dixie Machinery Company" for the construction equipment used on the job, and that the rental paid was $12,061.00. And we might mention that an item of cost of construction was $10,383.41 paid to the Ready Mixed Concrete Company.

While there is no direct evidence that Frew was one of the conspirators, it is not without significance that after the death of Boyle and the organization of the J. J. Pryor Construction Company, he (Frew) left the Boyle-Pryor Construction Company, whose general superintendent he had been for six years, to become construction superintendent of the newly organized company in which he held 25% of the stock. And Pryor's connections and relations with Murray, the *gratuities* to Murray, with which Pryor was connected, and the fact that Pryor did not choose to testify, although he and his wife had somewhat near $100,000.00 at stake, are not without significance.

We think that the reasoning in the excerpt, supra, from plaintiffs' brief, is sound. First National Bank of Monett v. Wilson et al. (Mo. Sup.), 222 S. W. 381, was to quiet title. Defendants were R. C. and E. S. Wilson, brothers, who inherited the land from their father. E. S. Wilson was quite involved financially, and in June, 1910, by reason of a judgment rendered in what is called the McQuary case, he became liable on a cost bond in that case. Shortly after this judgment, E. S. Wilson conveyed his one-half interest in the land to R. C. Wilson. Thereafter execution was issued to recover costs in the McQuary case and the interest that E. S. Wilson conveyed to his brother was levied upon and sold to two circuit court clerks who had costs in the McQuary case. The clerks filed suit against R. C. Wilson to set aside the E. S. Wilson deed. After the suit to set aside was filed, R. C. Wilson purchased from the clerks. The interest conveyed to R. C. Wilson by E. S. Wilson was worth in excess of $10,000, and the consideration paid the clerks by R. C. Wilson "was not in excess of $600."

The plaintiff bank got judgment against E. S. Wilson for $4554 and execution was levied upon the interest held by R. C. Wilson and conveyed to him in the deed from his brother and in the deed from the clerks. The interest was sold under this execution and the plaintiff bank purchased at the execution sale and thereafter brought the suit to quiet title.

It was held [222 S. W. l. c. 384] that R. C. Wilson entered into a conspiracy with his brother by which he received and held his brother's

property for the purpose of defrauding his creditors, including the plaintiff, and that "such conspiracy continued, and the subsequent purchase from Baker and Nicholson (the clerks), in March, 1911, was made in pursuance of such conspiracy and was part and parcel thereof."

State v. Bersch et al., 276 Mo. 397, 207 S. W. 809, was an arson case. The court, in the First National Bank of Monett case, supra, cited the Bersch case and said [222 S. W. 1. c. 383]: "The defendants were indicted for setting fire to a certain stock of merchandise for the purpose of securing the insurance thereon. There was evidence of a conspiracy to thus fraudulently obtain the money from the insurance company. But it was urged that the conspiracy ended when the fire took place, as there was no evidence that any attempt was made to collect the insurance money. But the court held that the conspiracy continued, and was not ended until the insurance money was collected, and there was no evidence tending to show that the purpose of the defendants to obtain the money was abandoned. In other words, the conspiracy to defraud having been established, it will be presumed to continue, and not to be abandoned until its purpose is accomplished."

"Where the existence of a certain condition or state of affairs of a continuous nature is shown, the general presumption arises that such condition or state continues to exist, until the contrary is shown by either direct or circumstantial evidence, so long as is usual with conditions or things [199] of that particular nature." Kelly v. Laclede Real Estate Investment Co., 348 Mo. 407, 155 S. W. (2d) 90, 1. c. 94; Missouri Power & Light Co. v. City of Bucklin et al., 349 Mo. 789, 163 S. W. (2d) 561, 1. c. 564, and cases there cited.

In addition to plaintiffs' theory that the admitted conspiracy, prior to the present sewer contract, was sufficient to raise the presumption that said conspiracy continued and included and contaminated "the contract in suit", we think that the evidence is amply sufficient to directly connect the J. J. Pryor Construction Company with the conspiracy and that the conspiracy worked in the present contract as it had prior thereto.

It is true that the J. J. Pryor Construction Company is a corporation, but "courts, both at law and in equity, will disregard the fiction of corporate entity apart from the members of the corporation when it is attempted to be used as a means of accomplishing a fraud or an illegal act." 14 C. J., p. 61, sec. 22. Such, we think, is the situation here.

A paragraph from Pan American Petroleum & Transport Co. et al. v. United States et al., 273 U. S. 456, 1. c. 500, 47 S. Ct. 416, 71 L. Ed. 734, is quite applicable:

"The facts and circumstances disclosed by the record show clearly that the interest and influence of Fall, as well as his official action,

were corruptly secured by Doheny for the making of the contracts and leases; that, after the executive order of May 31, 1921, Fall dominated the administration of the Naval Reserves, and that the consummation of the transaction was brought about by means of collusion and corrupt conspiracy between him and Doheny. Their purpose was to get for petitioners oil and gas leases covering all the unleased lands in the Reserve. The making of the contracts was a means to that end. The whole transaction was tainted with corruption. It was not necessary to show that the money transaction between Doheny and Fall constituted bribery as defined in the Criminal Code or that Fall was financially interested in the transaction or that the United States suffered or was liable to suffer any financial loss or disadvantage as a result of the contracts and leases. It is enough that these companies sought and corruptly obtained Fall's dominating influence in furtherance of the venture. It is clear that, at the instance of Doheny, Fall so favored the making of these contracts and leases that it was impossible for him loyally or faithfully to serve the interests of the United States.''

The record in the present case abundantly reflects that J. J. Pryor, individually, the Pryor and Pendergast companies, and Murray and Hyland were outstanding in the conspiracy alleged, and it can not in reason be said, under the facts in this record, that the conspiracy stopped at the door of the present contract. The Mayor, the City Council, and Murray were public officers, and Hyland purported to be. What was said in Trist v. Child, 21 Wall. 441, 1. c. 450, is, we think, pertinent here. We quote: ''The theory of our Government is, that all public stations are trusts, and that those clothed with them are to be animated in the discharge of their duties solely by considerations of right, justice, and the public good. They are never to descend to a lower plane.''

It is our conclusion that the evidence shows that the sewer contract and tax bills were contaminated by the conspiracy alleged and abundantly proved, hence it will not be necessary to rule other questions.

We think that the evidence, so far as there is any evidence in that respect, is to the effect that the sewer was needed; that a reasonably good job was done and at a reasonable price. But all that does not excuse the conspiracy or validate the contract and tax bills contaminated by the conspiracy. Such only tended to make less likely any complaint from the public and in the same proportion tended to prolong the life of the conspiracy, and to continue the monopoly of the conspirators.

We recognize that this opinion is rather long, but the record consists of about 1000 pages and the combined briefs over 344 pages, and it is difficult to put a finger on that which could be well omitted.

848

The judgment should be reversed and the cause remanded with direction to enter judgment in accordance with the prayer of plaintiffs' petition. It is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.